**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Franklyn Cabrera GARCIA, Mindi CARON, Jay PROBASCO, Lisa TAMBURELLO, and Nathan TAYLOR, individually and on behalf of others similarly situated,<br><br>            Plaintiffs,<br><br>       v.<br><br>CHRYSLER GROUP LLC (n/k/a FCA US LLC),<br><br>            Defendant. | Civil Action No.  1:14-cv-08926-KBF<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## Contents

NATURE OF THE CASE ........................................................................................ 4

INTRODUCTION ................................................................................................ 6

PARTIES ............................................................................................................ 9

JURISDICTION AND VENUE ............................................................................ 10

FACTUAL BACKGROUND ................................................................................ 11

    The TIPM Defect ......................................................................................... 11

    Chrysler's Knowledge of the TIPM Defect ................................................ 13

    Chrysler's Failure to Disclose the Defect .................................................. 43

    Chrysler's Warranties to Plaintiffs and the Class Members ...................... 45

PLAINTIFFS' EXPERIENCES ............................................................................ 48

    Plaintiff Franklyn Cabrera Garcia ............................................................. 48

    Plaintiff Mindi Caron ................................................................................. 52

    Plaintiff Jay Probasco ................................................................................ 54

    Plaintiff Lisa Tamburello ........................................................................... 56

    Plaintiff Nathan Taylor .............................................................................. 61

STATUTE OF LIMITATIONS ............................................................................. 62

CLASS ALLEGATIONS ..................................................................................... 63

VIOLATIONS ALLEGED ................................................................................... 68

    CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS ........................ 68

        Claim I: Violation of the Magnuson-Moss Warranty Act ..................... 68

    CLAIMS BROUGHT ON BEHALF OF THE ARIZONA SUBCLASS ......................... 73

        Claim II: Violations of the Arizona Consumer Fraud Act ..................... 73

        Claim III: Breach of Contract / Common Law Warranty ..................... 75

        Claim IV: Fraudulent Concealment ...................................................... 76

    CLAIMS BROUGHT ON BEHALF OF THE FLORIDA SUBCLASS ......................... 78

        Claim V: Violations of the Florida Deceptive and Unfair Trade Practices Act ... 78

    CLAIMS BROUGHT ON BEHALF OF THE NEW YORK SUBCLASS ...................... 80

        Claim VI: Deceptive Acts or Practices ................................................. 80

Claim VII: False Advertising ................................................................. 82

Claim VIII: Breach of Express Warranty ........................................... 83

CLAIMS BROUGHT ON BEHALF OF THE SOUTH DAKOTA SUBCLASS ........... 85

Claim IX: Consumer Protection Law ................................................. 85

CLAIMS BROUGHT ON BEHALF OF THE TEXAS SUBCLASS ............................. 87

Claim X: Violations of the Texas Deceptive Trade Practices Act........................ 87

Claim XI: Breach of Implied Warranty of Merchantability ................................ 90

REQUEST FOR RELIEF ...................................................................................... 92

DEMAND FOR JURY TRIAL ............................................................................. 93

## NATURE OF THE CASE

Plaintiffs Franklyn Cabrera Garcia, Mindi Caron, Jay Probasco, Lisa Tamburello, and Nathan Taylor (collectively, "Plaintiffs"), individually and on behalf of all other members of the below-defined nationwide class and statewide subclasses they respectively seek to represent for their Second Amended Class Action Complaint (the "Second Amended Complaint") allege against Chrysler Group LLC, now known as FCA US LLC ("Chrysler"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

1.     This is a consumer class action brought by Plaintiffs concerning the fraudulent concealment by Chrysler of a known defect in its Totally Integrated Power Module ("TIPM" or "TIPM-7"), a unit found in many of Chrysler's popular vehicles on the road today.

2.     The TIPM is the vehicle's electronic nerve center.  It is a printed circuit board-based module containing fuses, internal relays, and a microprocessor.  It is responsible for controlling and distributing power to all of the vehicle's electrical functions, including ignition and safety systems, the fuel pump, airbags, windshield wipers, turn signals, headlights, and taillights.

3.     The seventh generation TIPM installed in the Class Vehicles, referred to by Chrysler as the "TIPM-7," is prone to sudden failure and cannot be reasonably repaired.[1]  The TIPM-7 was first introduced in 2007 model year ("MY") Chrysler vehicles, and Chrysler continued to install the TIPM-7 through the 2014 model year.  The Class Vehicles comprise the

---

[1] Unless indicated otherwise, all uses herein of the abbreviation "TIPM" refer to the TIPM-7.

following makes and model years, and come factory-equipped with the TIPM located under the

hood in the engine compartment, adjacent to the battery:

a.  Chrysler 200 (2012–2013);
b.  Chrysler Grand Voyager (2010–2014);
c.  Chrysler Sebring (2011–2013);
d.  Chrysler Town & Country (2010–2014);
e.  Dodge Avenger (2012–13);
f.  Dodge Caravan (2010–2012);
g.  Dodge Durango (2011–2013);
h.  Dodge Grand Caravan (2010–2014);
i.  Dodge Journey (2010);
j.  Dodge Journey AWD (2010);
k.  Dodge Nitro (2010–2012);
l.  Dodge Ram 1500 Pickup (2010–2012);
m.  Dodge Ram 2500 Pickup (2010–2012);
n.  Dodge Ram 3500 Pickup (2010–2012);
o.  Dodge Ram 3500 Cab Chassis (2010–2012);
p.  Dodge Ram 4500 Cab Chassis (2011–2013);
q.  Dodge Ram 5500 Cab Chassis (2011–2013);
r.  Dodge Ram Cargo Van (2012–2014);
s.  Jeep Cherokee (2011);
t.  Jeep Grand Cherokee (2011–2012);
u.  Jeep Liberty (2010–2012); and
v.  Jeep Wrangler (2010–2014).

4.  The following makes and model years also come factory-equipped with the

TIPM:

a.  Chrysler Town & Country (2008);
b.  Dodge Caravan (2008);
c.  Dodge Grand Caravan (2008–2009);
d.  Dodge Journey (2008–2009);
e.  Dodge Nitro (2007–2009);
f.  Jeep Liberty (2008–2009); and
g.  Jeep Wrangler (2007–2009).

5. The Class Vehicles and the TIPM were designed, manufactured, distributed, and maintained by, or at the direction of, Chrysler.

6. Because the TIPM controls the distribution of power to *all* of the Class Vehicles' electrical functions, the defect often leaves Class Vehicles incapable of providing reliable or safe transportation. Having a faulty TIPM is like driving a possessed car, due to the fact that almost any part of the vehicle can function improperly or fail to function entirely when the TIPM unexpectedly fails—from windows rolling down automatically to the fuel pump staying on after the ignition key is removed to outright stalling.

7. Chrysler's fraudulent concealment of the defective TIPM presents a serious safety concern to drivers, passengers, and all who share the road with any of the Class Vehicles while also subjecting consumers to significant replacement costs.

8. Each of the Plaintiffs owned, leased, owns, or leases a Class Vehicle and has suffered unavoidable damages because of the defective TIPM.

### INTRODUCTION

9. Chrysler prides itself on being an innovative and revolutionary leader in the automotive industry for more than 85 years. Since its inception, Chrysler has branded itself as a company which strives for engineering and design excellence. Unfortunately, millions of consumers who bought into this brand have suffered harm because of the defective TIPM.

10. As early as 2007, Chrysler was aware that the TIPM installed in the Class Vehicles is prone to sudden failure. (As early as 2005, Chrysler was aware that a defective TIPM could have disastrous, life-threatening consequences; as set forth below, Chrysler recalled MY 2006 Dodge Ram 1500 4x4 vehicles in 2005 for a safety defect in the TIPM-6, the TIPM

generation preceding the TIPM-7 installed in the Class Vehicles.)  Yet Chrysler continued to install the defective TIPM-7 in the Class Vehicles.  Moreover, Chrysler has actively concealed, and continues to conceal, its knowledge concerning the defective TIPM-7.

11.     Chrysler has taken affirmative efforts to conceal the failures through, among other things, multiple limited-scope vehicle recalls and Technical Service Bulletins ("TSBs") issued to its nationwide network of authorized dealers and service providers.  Indeed, Chrysler was sufficiently aware of the problem as a result of numerous customer complaints made to Chrysler, dealers, and the National Highway Traffic Safety Administration ("NHTSA").

12.     The complaints made directly to Chrysler and to its dealerships are exclusively in the possession of Chrysler and those dealerships.

13.     The TSBs are exclusively in the possession of Chrysler, its network of dealers, and possibly NHTSA.  The TSBs at issue—described below—were not, and still are not, publicly available because neither Chrysler nor NHTSA has classified the TIPM defects described in those TSBs as "safety defects."  Moreover, even if those TIPM defects were classified as "safety defects," the NHTSA website would publish only summaries of the TSBs because the agency—in agreement with the Alliance of Automobile Manufacturers—asserts that the whole bulletins are copyrighted, technical communications not intended for consumers but rather for trained service technicians and service advisors.[2]  The relevant TSBs are still unavailable to consumers.

---

[2] Siobhan Hughes, *Safety Regulator Balks at Disclosing Full Alerts*, THE WALL STREET JOURNAL (Jun. 16, 2014), http://www.wsj.com/articles/car-dealers-get-alerts-why-not-drivers-1402959463.

14.     Despite Chrysler's knowledge of the TIPM defects, it has failed to inform consumers about the defective TIPMs and has failed to provide a permanent solution to remedy all of the TIPM defects.  Instead, Chrysler has concealed its knowledge of the defects and offered insufficient, piecemeal solutions to only a limited range of makes and models.

15.     As a result of Chrysler failing to disclose that the TIPM is prone to sudden failure, consumers are exposed to life-threatening dangers and must spend substantial sums of money to diagnose the TIPM-related problems and replace the defective TIPM.  The fact that the TIPM is prone to sudden failure is material for several reasons:

     a.     Any reasonable person's leasing, purchasing, and repair decisions would be materially affected by the knowledge of the TIPM's true nature.

     b.     Whether a manufacturer stands behind its products is material to prospective purchasers' and prospective lessees' decision to buy or lease a vehicle.

     c.     The functionality and reliability of the TIPM plays a significant role in the value of the Class Vehicles.

     d.     No reasonable consumer expects to spend a significant amount of money to replace such an essential component in their vehicle during the early years of vehicle ownership.

     e.     No reasonable consumer expects to spend a significant amount of money to replace an essential vehicle component because of a safety defect about which the manufacturer was aware yet refused to remedy, regardless of when the defective component fails.

     f.     Failure of the TIPM presents a serious safety issue and places the driver and passengers at risk of harm.  The TIPM is a central component of the Class Vehicles.  When the TIPM fails, it causes a variety of problems for the Class Vehicles, including vehicle stalling, unintended acceleration, sudden loss of electricity, inability to turn the vehicle off, sudden loss of headlights and taillights, inability to shut off the fuel pump, loss of security or ignition systems, airbag non-deployment, vehicle fire, and loss of control of windshield wipers and turn signals.

g.    There is no safe alternative for owners of the Class Vehicles to avoid the risk of potential harm without completely replacing the entire TIPM. This need for full replacement has led to significant demand for new TIPMs, which in turn has forced consumers to wait weeks or even months for the new part. Also, Chrysler's on-going concealment of the defect has led to consumers incurring unnecessary costs to replace non-defective parts, such as fuel pumps and batteries, which malfunctioned because of the faulty TIPM.

16.    Chrysler's failure to disclose the material fact that the TIPM is defective and prone to sudden failure also has recklessly placed the safety of the owners and occupants of the Class Vehicles at risk, and caused owners of those vehicles to suffer damages. Plaintiffs seek, on behalf of themselves and the proposed Nationwide Class and statewide subclasses, injunctive relief, restitution, damages, and other appropriate relief.

## PARTIES

17.    Plaintiff Franklyn Cabrera Garcia ("Plaintiff Garcia") is a citizen and resident of the Bronx, New York, located in the County of Bronx.

18.    Plaintiff Mindi Caron ("Plaintiff Caron") is a citizen and resident of Rapid City, South Dakota, located in the County of Pennington.

19.    Plaintiff Jay Probasco ("Plaintiff Probasco") is a citizen and resident of Tucson, Arizona, located in the County of Pima.

20.    Plaintiff Lisa Tamburello ("Plaintiff Tamburello") is a citizen and resident of Miramar, Florida, located in the County of Broward.

21.    Plaintiff Nathan Taylor ("Plaintiff Taylor") is a citizen and resident of San Antonio, Texas, located in the County of Bexar.

22.    Defendant Chrysler Group LLC, now known as FCA US LLC ("Chrysler"), is a Delaware limited liability company. FCA US LLC's members are FCA North America

Holdings LLC and Fiat Chrysler Automobiles N.V.  In turn, FCA North America Holdings LLC's sole member is Fiat Chrysler Automobiles N.V.—an entity formed and with its headquarters outside of the United States.

<strong><u>JURISDICTION AND VENUE</u></strong>

23.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which members of the Class (as defined below) are citizens of states different from Defendant, 28 U.S.C. § 1332(d)(2)(A).  Further, greater than two-thirds of the members of the Class are citizens and reside in states other than the states in which Defendant is a citizen.

24.     In addition, this Court has original jurisdiction of this action based on federal question jurisdiction under 28 U.S.C. § 1331 and the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*

25.     Moreover, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the related state law claims because all of the claims are derived from a common nucleus of operative facts and are such that plaintiffs would ordinarily expect to try them in one judicial proceeding.

26.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.  This Court has personal jurisdiction over Chrysler because it conducts substantial business in this District and some of the actions and omissions giving rise to the claims asserted in this Second Amended Complaint took place in this District.

27.     Venue is proper within this District under 28 U.S.C. § 1391 because Chrysler, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.  In addition, Chrysler has sufficient contacts with this District to subject it to personal jurisdiction in this District, and a substantial part of the events and omissions giving rise to the claims asserted in this Second Amended Complaint occurred within this District.

## FACTUAL BACKGROUND

28.     At all times relevant to this action, Chrysler and/or its agents manufactured, sold, and leased the Class Vehicles at issue under the Chrysler, Dodge, and Jeep brand names throughout the United States, including in Arizona, Florida, New York, South Dakota, and Texas.

29.     Chrysler and/or its agents also designed, manufactured, and installed the defective TIPMs in the Class Vehicles.

30.     Chrysler provides maintenance services for the Class Vehicles through its nationwide network of authorized dealers and service providers.

### The TIPM Defect

31.     The Class Vehicles are factory-equipped with a defective TIPM that fails suddenly, generally without warning, and well before the end of the useful life of the vehicles. The nature of the defect is that the TIPM  fails to control and distribute power reliably to various electrical systems and component parts.

32.     As a result of the failure, the Class Vehicles become too dangerous to drive and the defective TIPM must be replaced.  Because of the sheer number of vehicles that require a new TIPM, consumers are forced to either drive a defective and unsafe vehicle or go without

their vehicle for a significant amount of time (weeks or even months)—because replacement TIPMs are on backorder nationwide.

33. In August 2014, the owner of CarComplaints.com, Mike Wickenden, stated that TIPM-related problems are the most widespread issue reported by car owners in 2014. As of then, there were "about 300 complaints about 2011–12 Jeep Grand Cherokee and Dodge Durango . . . vehicles on his website, and about half involve[d] the [TIPM]."[3]

34. Replacing the TIPM also forces consumers to incur substantial costs which can be in the hundreds or thousands of dollars. According to ChryslerProblems.com, the average TIPM repair cost is $1,200.

35. Because the TIPM fails without warning, it poses a safety concern that is not reasonably avoidable for drivers or passengers who are at risk of being involved in a car accident.

36. Many Class Vehicle owners have reported such complaints, and Chrysler is well aware of the problem and safety risks. These complaints have been made to Chrysler directly, including through the company's nationwide network of dealers and to Chrysler's customer service agents. Additionally, NHTSA has documented many complaints concerning problems with the defective TIPM. Chrysler also has conducted several TIPM-related vehicle recalls. Chrysler, however, refuses to remedy the defective TIPM completely or to even publicly acknowledge the problem. Instead, Chrysler has taken steps to actively conceal the defect from consumers.

---

[3] Christopher Jensen, *Chrysler Owners Sound Off on a Power Defect*, THE NEW YORK TIMES (Aug. 22, 2014), http://nyti.ms/1oZaazx.

37.     As of August 22, 2014, Ann Smith, a spokeswoman for Chrysler, had stated that "Chrysler Group is actively investigating customer complaints and analyzing returned [TIPM] parts in an effort to diagnose the source of various issues experienced by customers."[4]  But Chrysler still has refused to acknowledge that the TIPM is defective, beyond the insufficient, limited-scope recalls discussed below.

38.     Chrysler has not admitted the existence of the TIPM defect or explained whether the replacement TIPMs installed in Class Vehicles are identical to the defective TIPMs installed at the factory.  Therefore, Plaintiffs and Class members (defined below)[5] with replacement TIPMs cannot be certain that TIPM-related problems will not continue to threaten their safety, and replacement TIPMs are treated herein as being equally defective as factory-installed TIPMs.

### Chrysler's Knowledge of the TIPM Defect

39.     Chrysler had superior and exclusive knowledge of the TIPM defects, and knew or should have known that the defects were not known by or reasonably discoverable by Plaintiffs and Class members (defined below) before they purchased or leased the Class Vehicles.

40.     Chrysler's knowledge of the TIPM-7 defects since at least 2007 is demonstrated by the numerous consumer complaints submitted to Chrysler and to NHTSA, multiple TIPM-related recalls and technical service bulletins, two NHTSA investigations into TIPM-related complaints, Chrysler's exhaustive pre-release vehicle testing, and Chrysler's exclusive access to post-sale data about the performance of and repairs made to its vehicles.  The use of limited

---

[4] *Id.*
[5] Any references to "Class members" refers to the class members defined in paragraph 187 below.

recalls and TSBs as stop-gap measures demonstrates a pattern of concealment and improper denial of the TIPM defect by Chrysler.

*NHTSA Recall 05V-461*
*(Defective TIPM-6 Causing Vehicles to Roll Away Without Warning)*

41.     In October 2005, Chrysler recalled model year ("MY") 2006 Dodge Ram 1500 4x4 vehicles to reprogram (i.e., "flash") the TIPM-6 with new software to cure a safety-related defect.

42.     The defect was that the TIPM-6 could have incorrect transfer case calibration set points.  As a consequence, the transfer case could shift into neutral without warning and, if the parking brake were not engaged, the vehicle could roll away.

43.     Chrysler admitted that because of the defect, "the vehicle could roll away with the transmission in the Park position and cause a crash without warning."

44.     This defect shows that Chrysler was aware of the dangerous, life-threatening consequences of a defective TIPM.  Yet, despite this knowledge, Chrysler manufactured the next generation TIPM, the TIPM-7, without resolving the module's propensity to cause life-threatening crashes.

*NHTSA Investigation PE07-027 / NHTSA Recall 07V-291*
*(Defective TIPM Causing Engine Stalling)*

45.     In May 2007, NHTSA's Office of Defect Investigation ("ODI") opened Preliminary Evaluation PE07-027.

46.     The ODI had received 53 consumer complaints alleging incidents of engine stalling in MY 2007 Jeep Wrangler vehicles, prompting the evaluation.  Most of the stalls

occurred suddenly, and in 12 of them a loss of electrical power causing a loss of vehicle lighting coincided with the stalls.

47.     The purpose of NHTSA's evaluation was to assess the frequency, scope, and safety consequences of the defect in the subject vehicles.

48.     The ODI agreed to close the evaluation when, on July 3, 2007, Chrysler agreed to recall approximately 80,894 MY 2007 Jeep Wrangler and MY 2007 Dodge Nitro vehicles (NHTSA Recall 07V-291).

49.     To remedy the stalling problem, Chrysler agreed to reprogram the TIPM in the subject vehicles with revised software.  Chrysler admitted that there was an "issue" with the TIPM "that could result in an engine stall while driving," which could "cause a crash without warning."

50.     At the time the evaluation was closed, the ODI had received 230 consumer complaints, two of which involved crashes and injuries.  Chrysler had directly received 279 complaints by this time.

51.     This recall did not cure all of the TIPM defects in the 2007 Dodge Nitro, as demonstrated by the fact that the 2007 Dodge Nitro was recalled again in November 2009 for a safety defect concerning TIPM-related windshield wiper problems.

52.     Because the same TIPM was installed in the MY 2007 Dodge Nitro as in the Class Vehicles, this recall demonstrates Chrysler's knowledge of the defective TIPM in the Class Vehicles.

53.     This recall did not resolve the stalling problems caused by the faulty TIPM, as demonstrated by a consumer complaint submitted to NHTSA on February 7, 2008 in which the

complainant describes stalling in a MY 2007 Jeep Wrangler *after* having the recall repairs, and subsequently being told by a dealership service manager that the TIPM had to be replaced to cure the stalling problem.  (NHTSA ID No. 10217364, included in its entirety below.)

*Technical Service Bulletin 08-018-08*
*(Defective TIPM Causing Inability to Record Data)*

54.     In May 2008, Chrysler distributed TSB 08-018-08 to its nationwide network of authorized dealers and service providers.

55.     This TSB is not publicly available, either in summary form or in its entirety, because neither Chrysler nor NHTSA classified the TIPM defect addressed in the TSB as a *safety defect*.

56.     The TSB covered the following makes and model years sold in the United States:

> a.     Chrysler Town & Country (2008);
> b.     Dodge Caravan (2008);
> c.     Dodge Journey (2008);
> d.     Dodge Nitro (2008);
> e.     Jeep Liberty (2008); and
> f.     Jeep Wrangler (2008)

57.     The TIPM defect purportedly resolved by this TSB involved data recording—specifically, the inability to record data because of TIPM software problems.

58.     The TSB states that "[d]ata recording is a valuable tool that provides assistance in diagnosing difficult to duplicate customer concerns.  Some of the[se] models . . . were incapable of utilizing the data recording features due to software compatibility concerns within the TIPM." In other words, Chrysler admitted internally that owners and lessees of these vehicles would suffer mechanical problems with their vehicles, take the vehicles in for repair, and be told that the onboard computer did not show that any mechanical "event" or "problem" had occurred.

Any reasonable consumer who has taken her car in for repairs would view this as a maddening scenario.

59.     It is troubling that this TIPM defect has not been classified as a safety defect. Although the failure to record data itself does not appear to cause a loss of vehicle control and is probably unnoticed by the driver, the failure to record real-time data could fail to record the manifestation of a safety defect, *such as stalling*, that would present a life-threatening safety hazard.  Chrysler's, as well as consumers', ability to detect the manifestation of a safety defect was severely compromised by the inability to record data caused by the defective TIPM.

60.     Because the TIPM installed in these vehicles is the same as in the Class Vehicles, Chrysler was aware—yet again—that the TIPM installed in Class Vehicles was defective, and again chose a stop-gap remedy on a limited set of vehicles.

61.     Because the TSB was not publicly available, owners and lessees of these vehicles were unaware of the issue and many of them likely did not obtain the TIPM repair described in the TSB.

62.     By proceeding with a non-public TSB instead of a publicly-announced safety recall, Chrysler chose to remain willfully blind about the manifestation of safety defects that a properly functioning TIPM would have enabled the data recorder to record.

63.     Rather than disclose the TIPM problem and offer an adequate solution, Chrysler attempted to conceal it by advising its network of authorized dealers and service providers to update and/or flash the TIPM instead of replacing it.

*NHTSA Recall 09V-438*
*(Defective TIPM Windshield Wiper Relays Increasing Risk of a Crash)*

64.     In November 2009, Chrysler notified NHTSA of a safety defect affecting the windshield wiper system on MY 2007 Dodge Nitro vehicles.

65.     The TIPM was defective in that a relay controlling the wipers could short out, causing the wipers to fail, in turn causing impaired driver visibility increasing the risk of a crash.

66.     Chrysler recalled 84,680 vehicles to reprogram the TIPM.

67.     Because the TIPM in the MY 2007 Dodge Nitro and in the Class Vehicles is the same, this recall demonstrates that Chrysler knew, at the time that Plaintiffs purchased or leased the Class Vehicles, that the TIPM was defective.

*Technical Service Bulletin 08-053-11*
*(Defective TIPM Causing Failure to Start and Intermittent Alarm Sound)*

68.     In August 2011, Chrysler distributed TSB 08-053-11 to its nationwide network of authorized dealers and service providers.

69.     This TSB is not publicly available, either in summary form or in its entirety, because neither Chrysler nor NHTSA have classified the TIPM defect addressed in the TSB as a safety defect.

70.     This TSB covered numerous MY 2011 vehicles:

> a.     Chrysler Town & Country;
> b.     Dodge Durango;
> c.     Dodge Grand Caravan;
> d.     Dodge Nitro;
> e.     Dodge Ram 1500 Pickup;
> f.     Dodge Ram 2500 Pickup;
> g.     Dodge Ram 3500 Pickup;
> h.     Jeep Cherokee;
> i.     Jeep Grand Cherokee;

j.      Jeep Liberty; and

k.      Jeep Wrangler

71.     All of the vehicles covered by this TSB are Class Vehicles.

72.     The TIPM was defective in that the vehicle theft alarm would intermittently sound for no apparent reason and the vehicles would fail to start.

73.     The TSB's purported fix was to flash reprogram the TIPM with new software.

74.     It is troubling that this TIPM defect has not been classified as a safety defect. If a vehicle alarm sounds during regular operation of the vehicle, it could be so jarring and distracting as to cause the driver to lose control of the vehicle. Once again, Chrysler chose to address this problem internally rather than conduct a safety recall which would have alerted its customers, NHTSA, and the public to the ongoing, repeated safety problems with the TIPM.

75.     Because the TIPM installed in these vehicles is the same as in the other Class Vehicles and these vehicles are themselves Class Vehicles, Chrysler was aware—once again—that the TIPM installed in Class Vehicles was defective, and again chose an inadequate stop-gap remedy on a limited set of vehicles.

76.     Rather than disclose the TIPM problem and offer an adequate solution, Chrysler attempted to conceal it by advising its network of authorized dealers and service providers to update and/or flash the TIPM instead of replacing it.

*NHTSA Recall 13V-282*
*(Defective TIPM Causing Non-Deployment of Active Head Restraints)*

77.     In July 2013, Chrysler initiated yet another TIPM-related safety recall. Chrysler notified NHTSA that the airbag warning lamp would incorrectly illuminate due to an electrical overstress condition within the Occupant Restraint Controller Module ("ORCM"), which would

in turn cause the active head restraints to not deploy in certain rear-impact collisions, thereby increasing the risk of injury to a front seat occupant.

78.    Chrysler recalled approximately 442,481 vehicles to flash the TIPM or replace the ORCM, as required.  The TIPM was flash reprogrammed in the following makes and model years:

    a.    Chrysler 200 (2012–2013);
    b.    Dodge Avenger (2012–2013); and
    c.    Jeep Liberty (2011–2012).

79.    It is unknown which remedy was applied to the 2011–2013 Chrysler Sebring vehicles.

80.    Once again, this recall evidences Chrysler's knowledge of the defective TIPM and shows Chrysler's repeated attempts to employ inadequate piecemeal remedies on a select subset of the Class Vehicles.

*Center for Auto Safety Submits Defect Petition to NHTSA*

81.    On August 21, 2014, the Center for Auto Safety ("CAS") submitted a defect petition to NHTSA, requesting that NHTSA "initiate a safety defect investigation into failures associated with the [TIPM] installed in Chrysler SUVs, trucks, and vans beginning in the 2007 model year."  The petition noted that TIPM failures result in a variety of safety-related problems, "many of which have the potential for destructive results," such as stalling, airbag non-deployment, failure of fuel-pump shutoff, and vehicle fires.

82.    CAS had received at least 70 complaints related to the TIPM in Class Vehicles, and a stall/no-start condition was the most reported outcome of TIPM failure.  Seventeen of these

complaints report engine stalling and 34 report a failure to start. Two of them report smoke and one reports a vehicle fire.

83. The CAS petition asserts that Chrysler's previous TIPM-related recalls were insufficient "to address the TIPM problem widespread throughout Chrysler's fleet, instead focusing on a highly limited set of vehicles and circumstances."

84. Plaintiffs have suffered the consequences of the TIPM failure described by CAS, and Plaintiffs agree with CAS's characterization of the TIPM problem as widespread throughout Chrysler's fleet and throughout the Class Vehicles.

*NHTSA Recall 14V-530*
*(Failure of Fuel Pump Relay Within the TIPM)*

85. On September 3, 2014, Chrysler notified NHTSA of yet another TIPM-related safety defect. This time, the fuel pump relay within the TIPM could fail, causing stalling without warning or failure to start. In Chrysler's words, "[t]he vehicle may intermittently or permanently: not start, not start the first time, not stay running upon start, stall, or the fuel pump may stay energized upon vehicle shutdown,"[6] and "[a]n intermittent or failed fuel pump relay could cause the engine to stall while driving and cause a crash without a warning."[7]

86. The remedy under the recall was to install a new fuel pump relay *external* to the TIPM. Chrysler may have decided that resolving the problem within the TIPM was not feasible, given the extensive defects and problems within the TIPM.

87. The recall covered 188,723 of the following Class Vehicles:

---

[6] Chrysler Group LLC, Part 573 Safety Recall Report, Sep. 3, 2014.
[7] Chrysler Group LLC, Recall 14V-530, Interim Notice Letter to Owners and Lessees, Jan. 6, 2015.

a.    Dodge Durango (2011); and

b.    Jeep Grand Cherokee (2011).

88.    Yet again, this recall demonstrates Chrysler's knowledge that the TIPM in the Class Vehicles was defective.  And again, Chrysler chose to implement an inadequate piecemeal remedy.

### *NHTSA Agrees to Evaluate the CAS Defect Petition*

89.    On September 8, 2014, the CAS supplemented its defect petition with additional consumer complaints about the TIPM.  In the supplement, the CAS identified 24 crashes from NHTSA's Early Warning Reporting ("EWR") database that the CAS believes may be related to TIPM failure.  Crash reports in the EWR database are submitted by the vehicle manufacturer, demonstrating Chrysler's awareness of these crashes.

90.    On September 25, 2014, NHTSA's ODI opened Investigation DP14-004 to evaluate the CAS's defect petition.  The investigation will "review allegations of [TIPM] failures resulting in engine stall while driving, airbag non-deployment incidents, unintended acceleration and/or vehicle fire in certain . . . vehicles . . . equipped with TIPM-7 modules and manufactured by Chrysler Group LLC[.]"[8]

91.    The ODI investigation covers approximately 4,800,000 vehicles equipped with the TIPM-7:

a.    Chrysler Town and Country (2008–14);
b.    Dodge Caravan (2008–12);
c.    Dodge Durango (2011–13);
d.    Dodge Grand Caravan (2008–14);
e.    Dodge Journey (2008–10) ;

---

[8] Nat'l Highway Traffic Safety Admin., Letter to Mr. Philip Hartnagel, Chrysler Group LLC, Oct. 20, 2014.

      f.       Dodge Journey AWD (2009–10);

      g.      Dodge Nitro (2007–12);

      h.      Dodge Ram 1500 (2009–12);

      i.       Dodge Ram 2500 (2010–12);

      j.       Dodge Ram 3500 (2010–12);

      k.      Dodge Ram 4500 (2011–12);

      l.       Dodge Ram 5500 (2011–12);

      m.     Jeep Grand Cherokee (2011–13);

      n.      Jeep Liberty (2007–12); and

      o.      Jeep Wrangler (2007–14).

92.     All of the vehicles associated with the investigation that are model year 2010 or later are Class Vehicles.

93.     On September 30, 2014, the CAS submitted another supplement to its defect petition, including approximately 25 new consumer complaints about the TIPM that it had received.

94.     With CAS's submission of its defect petition and supplements, and NHTSA's opening of the investigation, Chrysler is aware of all of the TIPM-related complaints made to the CAS. This is in addition to all of the TIPM-related complaints made to NHTSA about which Chrysler is, and has been, aware. At the very least, Chrysler has constructive knowledge of the consumer complaints submitted to NHTSA, which are publically available on the NHTSA website.

95.     In response to a request for information by NHTSA, Chrysler stated the following in a December 12, 2014 letter to NHTSA:

      a.     Chrysler had identified 709 reports which relate or may relate to the TIPM in the subject vehicles, representing 199 unique vehicle identification numbers ("VINs").

      b.     Chrysler had identified 605 consumer complaints, made to Chrysler, which relate or may related to the TIPM in the subject vehicles,

representing 189 unique VINs.  Chrysler did not specify when it received these complaints.

c.        Chrysler had identified 104 Field Reports which relate or may relate to the TIPM in the subject vehicles, representing 65 unique VINs.  Chrysler did not specify when it performed these field reports.

d.        Chrysler had identified 207 paid warranty claims related to repair or replacement of the TIPM-7 module, representing 126 unique VINs.

96.        In that letter, Chrysler stated also that it had identified *zero* reports of crash, fire, injury, or fatality which relates or may relate to the TIPM in the subject vehicles.  However, by the date of that letter consumers had submitted to NHTSA at least *six* reports describing crashes or fires in the relevant vehicles, rendering Chrysler's statement erroneous if not intentionally misrepresentative:

a.        On September 7, 2013, a consumer reported that "the TIPM fuse exploded" in a MY 2011 Jeep Grand Cherokee (NHTSA ID No. 10542447).

b.        On March 19, 2014, a consumer reported that the "wires and TIPM started melting and smoking and burned" in a MY 2012 Dodge Ram 5500 (NHTSA ID No. 10573426).

c.        On March 19, 2014, a consumer reported that the TIPM in a MY 2012 Dodge Ram 5500 had caught fire for the second time in a week and that the consumer had taken the truck to a dealership after the first fire (NHTSA ID No. 10573471).

d.        On June 5, 2014, a consumer reported that a five-car pileup occurred immediately behind her because she stalled in the middle of the road due to a faulty TIPM in a MY 2011 Dodge Durango (NHTSA ID No. 10596370).

e.        On September 18, 2014, a consumer reported that her MY 2011 Durango was "smoking" and that a dealership diagnosed the problem as an electrical short in the TIPM (NHTSA ID No. 10637171).

f.        On October 30, 2014, a consumer reported a crash caused by a stall in a MY 2008 Jeep Wrangler (NHTSA ID No. 10651411).

97.        This NHTSA investigation remains open and ongoing.

*Consumer Complaints to NHTSA*

98.     Chrysler has knowledge of the fact that the defective TIPMs installed in the Class Vehicles are prone to sudden failure because of the numerous complaints that consumers have made to NHTSA.

99.     Owners of Class Vehicles have submitted at least 240 complaints to NHTSA about electrical problems including stalling, headlights turning off, and failure to start—most, if not all, of which occurred with no warning whatsoever to the driver.

100.    By the end of 2011, consumers had submitted over 100 complaints about the TIPM to NHTSA.

101.    Some of these complaints describe dangerous situations, indicating that Chrysler is putting the lives of consumers and their passengers at risk.  When a defective TIPM suddenly fails without warning, a driver loses the ability to safely operate their vehicle.

102.    A small sampling of the complaints regarding TIPM failure reported to NHTSA is as follows.  NHTSA received six of these complaints *before* any of the Plaintiffs purchased their vehicles.  The first two complaints listed—submitted to NHTSA on April 24, 2007 and February 7, 2008—are by the same individual, describing stalling in a MY 2007 Jeep Wrangler caused by a faulty TIPM.  In one complaint—submitted to NHTSA on October 7, 2011—the log states clearly that NHTSA made Chrysler aware of the faulty TIPM problems.  In another—submitted to NHTSA on January 30, 2009—the complainant states that she notified Chrysler of the faulty TIPM by certified mail, phone, and e-mail.

**Date Complaint Filed: 04/24/2007**
> **Date of Incident:** 02/17/2007
> **NHTSA ID Number:** 10188682

**Vehicle:** 2007 Jeep Wrangler

**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:** 1J4FA24197L...

**SUMMARY:**

ELECTRICAL SYSTEM FAILURE—TWICE MY JEEP WRANGLER … 4X4 STALLED AND LOST POWER WHILE I WAS DRIVING 65-70 MPH ON A MAJOR FREEWAY IN HIGH TRAFFIC. BOTH CASES ARE VIRTUALLY IDENTICAL. FIRST OCCURRENCE WAS IN FEB. 17, 2007 AND THE 2ND TIME WAS TODAY, APRIL 23RD. I HAD BEEN DRIVING FOR ABOUT 30-40 MINUTES BEFORE THE POWER LOSS OCCURRED.  THE CAR LOST POWER, JERKING LIKE IT HAD BEEN DOWN SHIFTED INCORRECTLY.  ALL THE LIGHTS ON THE DASHBOARD TURNED ON, THE RADIO TURNED OFF AND THE GAS BELL RANG. WITHIN 3-5 SECONDS THE CAR JERKED SHARPLY AS THE POWER CAME BACK ON. I BROUGHT THE CAR IN TO THE DEALERSHIP SERVICE CENTER AFTER THE FIRST INCIDENT AND WAS TOLD THAT THEY COULDN'T FIND THE PROBLEM BUT THEY HAD "UPLOADED SOME NEW SOFTWARE". I ASKED IF THEY HAD RECEIVED ANY COMPLAINTS OF THIS TYPE OF ELECTRICAL FAILURE AND WAS TOLD NO. I AM BRINGING IT BACK IN AGAIN TOMORROW MORNING. WITH NO WAY TO PULL OFF THE FREEWAY, I WAS EXTREMELY LUCKY NOT TO HAVE BEEN HIT BY THE 18 WHEELER THAT WAS RIGHT BEHIND ME DURING THE FIRST INCIDENT AND THE FAST MOVING TRAFFIC BEHIND ME TODAY. THERE WERE TWO OTHER ELECTRICAL INCIDENTS THAT HAPPENED DURING THE LAST WEEK IN MARCH. ON MARCH 28TH, I STARTED THE CAR EVERYTHING WORKED AS NORMAL BUT THE RADIO WOULDN'T TURN ON AND THE CLOCK WASN'T ON. AFTER BEING ON THE ROAD FOR AN HOUR THE RADIO AND CLOCKED CAME ON BY THEMSELVES. ON MARCH 29TH, THE PASSENGER AIRBAG LIGHT CAME ON AFTER I HAD BEEN DRIVING 10 MINUTES - THERE WAS NOTHING ON THE SEAT—IT WENT OFF ABOUT 40 MINUTES LATER. I MADE AN APPOINTMENT THAT DAY TO BRING THE CAR IN ON SAT. MARCH 31ST, WHEN I GOT THERE I WAS TOLD THAT THE TECH'S THAT HANDLE THE ELECTRICAL WORK AREN'T IN ON SATURDAYS. I WILL HAVE THEM LOOK AT THIS TOMORROW TOO.

## Date Complaint Filed: 02/07/2008

**Date of Incident:** 02/05/2008

**NHTSA ID Number:** 10217364

**Vehicle:** 2007 Jeep Wrangler

**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:** 1J4FA24197L...

**SUMMARY:**

ON FEB 5TH, I WAS DRIVING ON THE FREEWAY AT ABOUT 65 MPH AND MY CAR DIED—DASH LIGHTS WENT ON, CAR JERKED TO A VIOLENT SLOW DOWN AND I ALMOST CRASHED INTO A SEMI ON MY LEFT, THE CAR PULLED TO THE LEFT.  ALL RESUMED TO NORMAL AFTER ABOUT 4 SECONDS. *I HAVE FILED PREVIOUS COMPLAINT, CONF NBR 10188682. THIS IS THE 4TH INCIDENT*  BUT WHAT IS MOST SHOCKING IS THAT THE FIRST 2 TIMES I BROUGHT IT TO THE DEALERSHIP REPAID SHOP I WAS TOLD THAT THEY COULDN'T DUPLICATE THE ERROR AND THAT THEY AND CHRYSLER CORP DIDN'T HAVE RECORD OF ANY OTHER REPORTS OF THIS PROBLEM.  ON THE 2ND VISIT, I ADVISED THE SERVICE PERSON THAT HE SHOULD LOOK AT THIS WEB SITE IF HE HAD NEVER HEARD OF THIS PROBLEM SINCE THERE WERE NUMEROUS COMPLAINTS.  ON THE 3RD INCIDENT, WHEN I GOT HOME, THERE WAS A RECALL "SAFETY RECALL G25-PROGRAM TIPM—ENGINE STALLING—SO I CALLED THE SERVICE CENTER, AGAIN, ADVISED THAT CAR STALLED AGAIN AND THAT I ALSO RECEIVED RECALL AND SCHEDULED THE SERVICE—AUG 2007. *AFTER THIS VISIT I FELT MORE SECURE TO DRIVE THE CAR BECAUSE AT LEAST CHRYSLER HAD ACKNOWLEDGED THE PROBLEM. THE ON FEB 5TH 2008 AS I WAS DRIVING TO WORK, IT HAPPENED AGAIN.* I CONTINUED TO WORK AND AT THE END OF THE DAY WHEN I WENT BACK TO THE CAR IT WOULDN'T START, ALL LIGHTS/RADIO ETC CAME ON BUT THE CAR WOULDN'T TURN OVER. I HAD IT TOWED TO JEEP. *I WAS TOLD BY SERVICE PERSON, AFTER THE CAR WAS INSPECTED THAT THE CONTROL MODULE—SAME ITEM THAT CAUSED PREVIOUS PROBLEMS, HAD TO BE REPLACED.* I PURCHASED THIS VEHICLE NEW, SO THAT I WOULD HAVE A DEPENDABLE AND SAFE VEHICLE—NEITHER OF WHICH IT IS!  I ASKED THE SERVICE MANAGER WHAT CHRYSLER COULD DO FOR ME. HE SAID THAT FROM THE NOTES IT LOOKED LIKE I ONLY HAD ONE OCCURRENCE WITH THIS ISSUE AND THAT THIS WAS THE FIRST HE HEARD OF THIS TYPE OF PROBLEM WITH JEEP—WOW—EITHER HE OUT RIGHT LIED TO ME OR HE IS AN UNINFORMED MANAGER. *NEEDLESS TO SAY I AM NOT CONFIDENT THAT THIS ISSUE WONT OCCUR AGAIN!*

**Date Complaint Filed: 12/13/2008**

**Date of Incident:** 11/15/2008

**NHTSA ID Number:** 10251653

**Vehicle:** 2008 Chrysler Town & Country

**Crash:** No        **Fire:** No        **Number of Injuries:** 0        **Number of Deaths:** 0
**VIN:** 2A8HR44H08R...
**SUMMARY:**

WE W[ERE] HAVING PROBLEMS WITH OUR HEADLIGHTS GOING OUT ON OUR 2008 TOWN AND COUNTRY VAN WE TOOK IT TO THE DEALERSHIP TO HAVE IT LOOKED AT AND THEY SAID IT WAS THE HEADLAMP SWITCH SO WE ORDERED ONE AND WENT BACK UP TO REPLACE IT AND THEY HAD THE WRONG SWITCH SO THEY HAD TO ORDER ANOTHER ON AND WE HAD TO RETURN TO PUT THE RIGHT HEADLAMP SWITCH IN.  THAT DID NOT FIX THE PROBLEM, SO WE TOOK IT BACK TO THE DEALERSHIP AND ***THEY REPLACED THE TIPM MODULE*** AND RETURNED THE VAN WE WENT ON A FAMILY VACATION JUST FOR THE DAY AND CAME HOME THAT EVENING WHEN WE FIGURED OUT THAT THEY ***DID NOT FIX THE PROBLEM***.  SO ONCE AGAIN WE RETURNED TO THE DEALERSHIP AND THEY GAVE US A LOANER CAR IF THAT'S WHAT YOU WANT TO CALL IT AND THEY HAD IT FOR SEVERAL DAYS AND THEY REPLACED A CENSOR THAT CONTROLS THE HEADLIGHTS.  I JUST GOT IT BACK AND NOT SURE IF THEY ARE FIXED OR NOT BUT THEY SAID THAT THEY ARE FIXED.  IF IT TURNS OUT THAT THEY ARE NOT FIXED WE WILL NOT RETURN TO THE DEALERSHIP TO FIX THE HEADLIGHTS AGAIN WE WILL FIND ANOTHER DEALERSHIP TO TAKE IT TO.  I WAS NOT TREATED TO BEST AND I GOT NONE OF MY FUEL REPLACED FROM THE DEALERSHIP AFTER IT TOOK THEM THIS MANY TIMES TO FIX IT AND THEY DROVE IT AROUND WE GAVE THEM PERMISSION BUT OUT OF THE COURTESY OF THE DEALERSHIP THEY COULD OF REPLACED MY FUEL CONSIDERING THE LOANER CAR THEY GAVE ME THEY SAID THAT I HAD TO RETURN IT WITH THE SAME AMOUNT OF GAS THAT I LEFT THE LOT WITH. NOW THAT DOESN'T SEEM FAIR TO ME DOES IT [TO] YOU[?]

**Date Complaint Filed: 01/30/2009**

**Date of Incident:** 10/16/2008
**NHTSA ID Number:** 10256999
**Vehicle:** 2008 Dodge Ram 1500

**Crash:** No        **Fire:** No        **Number of Injuries:** 0        **Number of Deaths:** 0
**VIN:** 1D7HU18238J...
**SUMMARY:**

THE ELECTRONIC TRANSFER CASE WOULD NOT ENGAGE 4 WHEEL LOW.  THEN WOULD NOT CHANGE TO 2 WHEEL DRIVE. THEN WHEN

MOTOR WAS TURNED OFF, IT WOULD NOT RESTART.  IT HAD TO BE TOWED TO THE NEAREST DODGE DEALER. *TIPM REPLACED, NEXT TIME ALL WHEEL DRIVE ENGAGED, TIPM BURNED OUT AGAIN.*  TOWED TO NEAREST DEALER. *THEY REPLACE TIPM AGAIN.*  SAID THEY COULD NOT FIX THE TRANSFER CASE.  THEY WERE GOING OUT OF BUSINESS AND SAID THAT I HAD TO TAKE TO ANOTHER DEALER. I DID, AND THEY STATED THAT CHRYSLER KNEW ABOUT THE PROBLEM. *I NOTIFIED CHRYSLER BY CERTIFIED MAIL*, PURSUANT TO IOWA LEMON LAW NOTIFICATION, EMAIL AND PHONE. NO RESPONSE.  IT IS NOW OVER 70 DAYS, AND NUMEROUS PHONE CALLS TO CUSTOMER SERVICE.  I GET PROMISES OF RETURN PHONE CALLS WITHIN 48 HOURS WHICH NEVER ARE RECEIVED AFTER 70 DAYS.  CUSTOMER SERVICE WILL NOT RELAY REGIONAL SERVICE OR SALES MANAGERS PHONE NUMBERS.  THEY KEEP BLAMING THE DEALERSHIP, FOR NOT CONTACTING THEM.  DEALERSHIP STATES THAT THEIR REGIONAL AND SERVICE MANAGERS HAVE LEFT CHRYSLER.  THEY GIVE ME THE ONLY PHONE NUMBER THEY HAVE, AND IT HAS A VOICE MAIL STATING THAT THEY ARE NO LONGER WITH CHYRSLER.  SO I HAVE HAD NO RETURN COMMUNICATION FROM CHRYSLER PERIOD.  TOTAL CUSTOMER ABANDONMENT

**Date Complaint Filed: 08/18/2009**
**Date of Incident:** 08/14/2009
**NHTSA ID Number:** 10280830
**Vehicle:** 2008 Chrysler Town & Country
**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0
**VIN:** 2A8HR54169R…
**SUMMARY:**
        BOUGHT THIS VEHICLE ON FRIDAY, 8/14/2009---*ALL ELECTRICAL EQUIP. STOPPED WORKING ON THE WAY HOME FROM THE DEALERSHIP*---NO GAUGES, NO POWER WINDOWS OR DOORS, NO TURN SIGNALS, NO BRAKE LIGHTS, NO A/C, NO RADIO---THE ONLY THING WORKING WERE THE WINDSHIELD WIPERS WHICH CAME ON BY THEMSELVES AND I COULD NOT SHUT THEM OFF---ALL THE WARNING LIGHTS ON THE DASH LIT UP---MADE IT HOME AND CALLED THE DEALERSHIP AND SET UP APPT. FOR MONDAY MORNING---VAN HAS LESS THAN 100 MILES ON IT AND ALREADY IN FOR SERVICE---CALLED DEALERSHIP MONDAY AFTERNOON, THEY CAN'T FIND ANY PROBLEMS, *MUST BE THE TIPM (TOTALLY INTEGRATED POWER MODULE)---THEY HAVE ORDERED THE PART, BUT IT IS ON BACKORDER UNTIL WHO KNOWS WHEN---VAN HAS BEEN DEEMED*

*UNSAFE TO DRIVE UNTIL REPAIRED*--DEALERSHIP PROVIDED ME WITH A SMALL SEDAN TO DRIVE UNTIL FIXED, BUT THIS VAN WAS PURCHASED BY MY FUNERAL HOME TO USE FOR BODY TRANSPORTATION, STRETCHERS, CASKETS, ETC.---SEDAN IS TOTALLY USELESS FOR MY BUSINESS.

**Date Complaint Filed: 06/16/2010**

**Date of Incident:** 06/04/2010

**NHTSA ID Number:** 10336594

**Vehicle:** 2010 Jeep Wrangler

**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:** 1J4BA6D15AL...

**SUMMARY:**

[1] NEW *JEEP WENT DEAD WHILE DRIVING*, ENGINE WON'T CRANK THIS WAS AT 181 MILES ON CAR [2] TOW TO DEALER [3] CONNECTOR C1 @PCM PINS 34 & 35 WERE REVERSED *INSTALLED NEW TIPM ALSO*. COULD NOT GET CAR OFF ROAD.

**Date Complaint Filed: 08/10/2010**

**Date of Incident:** 06/01/2010

**NHTSA ID Number:** 10348551

**Vehicle:** 2010 Dodge Ram 3500

**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:** 3D73Y3CL2AG...

**SUMMARY:**

WHILE DRIVING APPROXIMATELY 45 MPH THE 4 WHEEL DRIVE LOW LIGHT ILLUMINATED ON THE DASHBOARD. HE CONTINUED TO DRIVE UNTIL FINALLY PARKING THE VEHICLE. UPON RESTART THE LIGHT MOMENTARILY DID NOT ILLUMINATE UNTIL HE BEGAN DRIVING AGAIN. *THE VEHICLE WAS TAKEN TO AN AUTHORIZED DEALER WHERE THEY HAVE REPLACED THE TIPM TWICE*, THE 4 WHEEL DRIVE ACTUATOR MOTOR, THE AIR CONDITIONING COMPRESSOR, AS WELL AS VARIOUS WIRES AND COMPUTER COMPONENTS. *NONE OF THE REPAIRS HAVE BEEN ABLE TO REMEDY THE FAILURE.* THE FAILURE AND CURRENT MILEAGES WERE 15,000[.]

**Date Complaint Filed: 10/07/2011**

**Date of Incident:** 09/30/2011

**NHTSA ID Number:** 10429119

**Vehicle:** 2010 Dodge Journey

**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:** 3D4PG5FV2AT...

**SUMMARY:**

THE CONTACT STATED THAT THE SECURITY ALARM SYSTEM FAILED TO DISENGAGE UPON ENTERING THE VEHICLE. THE IGNITION WOULD NOT START AND ALL LOCKED DOORS FAILED TO UNLOCK. THE DRIVER SIDE DOOR WAS MANUALLY UNLOCKED. THE FAILURE RECURRED TWICE. ON THE FIRST OCCURRENCE, THE DEALER WAS UNABLE TO DETECT A TROUBLE CODE. THE VEHICLE WAS TAKEN BACK TO THE DEALER A SECOND TIME WHERE BOTH KEY FOBS WERE REPROGRAMMED. IN ADDITION TO THE REPAIR, THE WCM AND TIPM WERE REPLACED.  THE MANUFACTURER WAS MADE AWARE OF THE PROBLEM.  THE APPROXIMATE FAILURE MILEAGE WAS 4,000.  ***MANUFACTURER WAS MADE AWARE OF THIS PROBLEM AFTER TALKING TO NHTSA.***  UPDATED 11/01/2011.

**Date Complaint Filed: 03/26/2012**

**Date of Incident:** 03/16/2012

**NHTSA ID Number:** 10453093

**Vehicle:** 2010 Jeep Wrangler

**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:** 1J4BA3H12AL...

**SUMMARY:**

TIPM IS CREATING A MAJOR SAFETY ISSUE WITH MY 2010 JEEP WRANGLER. ON MULTIPLE OCCASIONS, THE HEADLIGHTS FAIL TO WORK ON MY VEHICLE ON START UP OR ONCE THE VEHICLE IS IN OPERATION. THE DEALERSHIP LOOKED AT THE JEEP AND STATED THE TIPM MODULE WAS BAD AND NEEDED TO BE REPLACED. THE PART WAS INDEFINITELY ON BACKORDER FROM JEEP, AND COULD NOT EVEN BE REPLACED IF IT WERE UNDER WARRANTY. DRIVING THIS VEHICLE THAT IS UNDER 2 YEARS OLD AND HAS A MAJOR SAFETY ISSUE IS UNACCEPTABLE. THIS APPEARS TO BE A WIDE SPREAD ISSUE FOR A NUMBER OF YEARS WITH THE TIPM MODULE ON JEEP / CHRYSLER VEHICLES. THIS WILL HAPPEN TO SOMEONE WHILE DRIVING AT NIGHT WITHOUT THEIR KNOWLEDGE, AND CREATE A DEADLY EVENT. WOULD LIKE TO SEE CHRYSLER TAKE RESPONSIBILITY FOR THIS DANGEROUS SITUATION AND CORRECT THE ISSUE TO PROTECT THE SAFETY OF THE MISSIONS OF PEOPLE DRIVING THEIR VEHICLES.

**Date Complaint Filed: 04/10/2012**

**Date of Incident:** 03/04/2012

**NHTSA ID Number:** 10454741

**Vehicle:** 2010 Chrysler Town & Country

**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:** 2A4RR5D18AR...

**SUMMARY:**

THE HEADLIGHTS FAILED WHILE DRIVING MY 2010 T&C VAN AT NIGHT. DEALER DETERMINED THE TIPM MODULE TO BE DEFECTIVE. THERE ARE OVER 300 OF THESE MODULES ON BACK ORDER IN THE USA. THIS HAS BEEN A KNOWN PROBLEM OF HEADLIGHT FAILURE WHILE DRIVING THE T&C VAN SINCE ABOUT 2006. THE DEALER COULD NOT PROVIDE ME A DATE THE REPLACEMENT MODULE WOULD BE AVAILABLE, BUT I HAD TO PAY $663.89 UP FRONT FOR THEM TO ORDER IT. THE HEADLIGHTS WILL NOT WORK AT ALL NOW WITH THIS DEFECTIVE MODULE. I NOW HAVE A DAY TIME, CLEAR DAY ONLY VAN SINCE MY STATE REQUIRED HEADLIGHTS WHEN DRIVING IN THE RAIN.

**Date Complaint Filed: 04/25/2012**

**Date of Incident:** 12/11/2011

**NHTSA ID Number:** 10456498

**Vehicle:** 2011 Jeep Wrangler

**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:** 1J4BA3H11BL...

**SUMMARY:**

POTENTIALLY A ROOT CAUSE OF THE RASH OF FIRES IN JEEP WRANGLERS THAT ARE SITTING PARKED: FAILURE OF THE TIPM (TOTALLY INTEGRATED POWER MODULE). IN DEC 2011, MY DAUGHTER DROVE HER NEW (3000 MILES) 2011 JEEP WRANGLER UNLIMITED TO CHURCH, PARKED IT, TURNED OFF THE KEY, TOOK THE KEY OUT OF THE IGNITION, EXITED THE VEHICLE AND LOCKED THE DOOR, AND WENT INTO THE CHURCH BUILDING - NEVER REALIZING THAT MOTOR WAS ACTUALLY STILL RUNNING!! (THEY'RE VERY QUIET WHEN IDLING AND SHE WAS TALKING TO A FRIEND.) ABOUT 20 TO 30 MINUTES LATER, A MAN CAME RUNNING INTO CHURCH THAT KNOWS OF HER VEHICLE AND SAID "YOUR JEEP IS RUNNING, THERE'S SMOKE OR STEAM COMING OUT FROM UNDER THE HOOD, THE DOOR IS LOCKED, AND I CAN'T GET IN TO TURN IT OFF! MY DAUGHTER CHECKED AND SHE INDEED HAD THE IGNITION KEY IN HER HAND. SHE RAN OUT OF CHURCH AND UNLOCKED THE DOOR, PUT

THE KEY IN THE IGNITION BUT IT WOULD NOT KILL THE ENGINE! WE HAD TO ENGAGE THE CLUTCH IN A HIGH GEAR ON THE MANUAL TRANSMISSION TO KILL IT. RADIATOR COOLANT ALL OVER THE GROUND. WE FOUND THAT RADIATOR FLUID WAS JUST ABOUT ALL BOILED OUT OF THE ENGINE. THE TIPM WAS ALLOWING THE ENGINE TO CONTINUE TO RUN EVEN THOUGH THE IGNITION WAS OFF AND KEY REMOVED - BUT THE TIPM DID SHUT OFF THE ELECTRICALLY OPERATED COOLING FAN IN FRONT OF THE RADIATOR. THERE WAS ELECTRICAL POWER GOING TO THE MOTOR IGNITION SO THAT THE MOTOR CONTINUED TO RUN - BUT W/O A FAN. THE COOLANT BOILED OUT OF THE ENGINE AND HAD OUR FRIEND NOT INTERVENED OUR MOTOR DEFINITELY WOULD HAVE BOILED ITSELF DRY AND CONTINUED TO RUN UNTIL IT EITHER SEIZED UP DUE TO EXCESSIVE HEAT AND/OR IGNITED A FIRE DUE TO THE EXCESSIVE HEAT (POTENTIALLY BY IGNITING THE FUEL WITHIN THE FUEL SYSTEM?? ELECTRICAL WIRE INSULATION CAUSING AN ELECTRICAL FIRE?? BATTERY BOILING AND FIRE??). AS YOU'RE AWARE, THERE ARE SEVERAL POTENTIAL SECONDARY SOURCES FOR FIRE IGNITION UNDER THE VEHICLE HOOD.

**Date Complaint Filed: 05/17/2012**

**Date of Incident:** 05/09/2012

**NHTSA ID Number:** 10458882

**Vehicle:** 2008 Chrysler Town & Country

**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:**  2A8HR44H38R...

**SUMMARY:**

WINDSHIELD WIPERS GOING WITHOUT BEING TURNED ON; WASHER FLUID CONTINUALLY SPEWING OUT; HORN HONKING CONTINUALLY; LIGHTS FLASHING ON AND OFF; DOORS LOCKED.  WHILE DRIVING TO THE DEALERSHIP, VAN STALLED IN TRAFFIC.  FINALLY WAS ABLE TO GET IT THERE WITH THE ENGINE RUNNING AND THE KEY OFF*. **COULD BE A VERY DANGEROUS SITUATION IF VEHICLE CAUGHT FIRE DUE TO ELECTRICAL PROBLEMS AND I AM UNABLE TO GET OUT BECAUSE THE DOORS ARE LOCKED AND THE KNOBS ARE DOWN IN THE DOOR SO YOU CAN'T PULL THEM UP TO ESCAPE.*  IT WAS LIKE THE VEHICLE WAS POSSESSED*.  I PURCHASED THIS VEHICLE FOR MY MOTHER TO DRIVE AND I AM AFRAID FOR HER TO USE IT. THE DEALERSHIP KEPT IT FOR A DAY AND SAID IT WOULD NEED A TIPM, BUT IT WAS ON BACK ORDER AND WOULDN'T BE IN UNTIL POSSIBLY 1-3 MONTHS. RIDICULOUS! THEY CAN MAKE SEVERAL

VEHICLES IN ONE DAY AND CAN'T A PART FOR 1-3 MONTHS. THEY SAID WE PROBABLY SHOULDN'T DRIVE IT. THAT'S CERTAINLY INCONVENIENT FOR US SINCE WE DON'T HAVE EXTRA VEHICLES. WHILE THE VEHICLE WAS SITTING IN MY DRIVEWAY, ALL OF THE SAME THINGS HAPPENED AGAIN-HORN HONKING, WINDSHIELD WIPERS GOING, WASHER FLUID SPILLING OUT, DOORS LOCKED-WHILE IT WAS JUST SITTING IN MY DRIVE. WE WERE TOLD TO UNHOOK THE NEGATIVE BATTERY CABLE. SOMETHING NEEDS TO BE DONE ABOUT THIS ISSUE BECAUSE APPARENTLY I AM NOT THE ONLY ONE WITH THIS PROBLEM AS NOTED IN OTHER ENTRIES LISTED. WE HAVE NOT HAD A CRASH, FIRE OR INJURY/FATALITY AS OF YET, BUT I WANT THE PROBLEM RESOLVED BEFORE THAT HAPPENS!!!

The above complaint is eerily reminiscent of Plaintiff Garcia's experience, in that his doors automatically locked during his vehicle fire, temporarily trapping him within the burning vehicle. This complaint put Chrysler on notice that the defective TIPM could trap vehicle occupants during a fire.

**Date Complaint Filed: 07/06/2012**
   **Date of Incident:** 05/25/2012
   **NHTSA ID Number:** 10464475
   **Vehicle:** 2008 Dodge Grand Caravan
   **Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0
   **VIN:** 1D8HN54P08B...
   **SUMMARY:**
        THE TIPM MODULE (TOTALLY INTEGRATED POWER MODULE) IS DEFECTIVE, AND INTERMITTENTLY DRAWS THE BATTERY DOWN. AFTER KEEPING THE VAN FOR SEVERAL DAYS, OUR LOCAL DEALERSHIP (BLUEBONNET MOTORS) IN NEW BRAUNFELS, TX, DETERMINED THAT THE BATTERY IS FINE, BUT THE PROBLEM IS WITH THE TIPM. THE MANUFACTURER HAS NO UNITS AVAILABLE FOR REPLACEMENT AT THIS TIME (SEVERAL HUNDRED ARE ON BACKORDER, AND NONE SCHEDULED FOR PRODUCTION). CHRYSLER HAS NOT OFFERED TO COVER THIS UNDER RECALL, AND WE ARE TOLD IT IS NOT COVERED UNDER OUR EXTENDED WARRANTY. AFTER RESEARCHING ON THE INTERNET WE READ MANY OTHER PEOPLE HAVE TIPM PROBLEMS, INCLUDING: WIPERS STARTING BY THEMSELVES; WINDSHIELD SPRAYERS SPRAYING WITHOUT WARNING;

HORN WILL START HONKING OUT OF CONTROL: LIGHTS FLASHING UNCONTROLLABLY (ALL OF THESE WHILE DRIVING); AND EVEN ONE UNIT THAT CAUGHT FIRE. ***OUR DEALERSHIP HAS INDICATED THAT THE SYSTEM INDICATES THAT AT LEAST SIX VEHICLES HAVE BEEN FLAGGED AS COMPLETELY UNUSABLE.*** WE FEEL THAT WE ARE DRIVING A ROLLING TIME BOMB, WITH THE POTENTIAL TO EITHER LEAVE US STRANDED, OR CAUSE HAZARDOUS DRIVING DISTRACTIONS AT ANY TIME, OR BOTH.

**Date Complaint Filed: 09/07/2013**

 **Date of Incident:** 07/25/2013

 **NHTSA ID Number:** 10542465

 **Vehicle:** 2011 Jeep Grand Cherokee

 **Crash:** No  **Fire:** No  **Number of Injuries:** 0  **Number of Deaths:** 0

 **VIN:** 1J4RR5GT1BC...

 **SUMMARY:**

  I TRIED TO START MY JEEP GRAND CHEROKEE 2011 WITH THE PUSH START AND IT TURNED OVER BUT WOULD NOT CRANK. I FINALLY GOT IT CRANK AFTER SEVERAL TRIES AND WAITING FIVE MINUTES. I HAVE SINCE EXPERIENCED INTERMITTENT PROBLEMS STARTING MY JEEP EACH MORNING OR AFTER IT SITS FOR MORE THAN FOUR HOURS. IN THE PAST WEEK I HAVE EXPERIENCED DIFFICULTY STARTING EVERYDAY. IT GETTING HARDER TO START. I READ ONLINE THAT A LOT OF PEOPLE ARE HAVING THE SAME PROBLEM AND SOMEONE RECOMMENDED USING THE REMOTE START BUTTON TO START YOUR VEHICLE. THAT IS THE ONLY WAY I HAVE BEEN SUCCESSFUL GETTING MY JEEP CRANKED EACH DAY. I TOOK MY VEHICLE TO THE JEEP DEALERSHIP AND ***THEY SAID I NEED A TIPM AND IT IS NOT COVERED UNDER WARRANTY.*** I AM A FEMALE NURSE WHO DRIVES MY CAR FOR A LIVING AND I DO NOT FEEL SAFE IN MY VEHICLE. I GO IN UNSAFE AREAS FOR MY JOB AND IT IS NOT A GOOD FEELING WORRY IF MY JEEP START. IT IS GOING TO COST OVER 1200.00 TO GET MY CAR REPAIRED AND PART IS ON BACK ORDER. I WORRY EVERYDAY THAT I WILL GET STRANDED AND THIS IS SUPPOSE TO BE AN AWARD WINNING SUV.  PLEASE HELP ME!

 NHTSA received this complaint about the 2011 Jeep Grand Cherokee—the same car that

Plaintiff Probasco owns—about 10 months *before* he purchased his vehicle in April 2014.

Between August 2013 and March 2014, NHTSA received approximately 80 complaints

concerning TIPM-related problems in the 2011 Jeep Grand Cherokee.

**Date Complaint Filed: 09/10/2013**

       **Date of Incident:** 07/21/2013
       **NHTSA ID Number:** 10542989
       **Vehicle:** 2011 Dodge Durango
       **Crash:** No       **Fire:** No       **Number of Injuries:** 0       **Number of Deaths:** 0
       **VIN:** 1D4SD4GT3BC...
       **SUMMARY:**

       WE STARTED HAVING ISSUES WITH THE CAR WANTING TO START OR START FOR A FEW SECONDS AND SLOWLY DIE UNTIL WE HEAR A KNOCKING SOUND. AFTER QUITE A FEW ATTEMPTS THE CAR WOULD FINALLY START. 2011 DODGE DURANGO, WAS THEN TAKEN TO THE DEALERSHIP WHERE IT WAS IDENTIFIED AS A FAULTY TIPM (TOTALLY INTEGRATED POWER MODULE) THAT WAS NOT SENDING SIGNAL CORRECTLY TO FUEL PUMP. DEALERSHIP MADE US PAY $900 PLUS FOR THE PART AND LET US DRIVE IT OFF THE LOT. ISSUE STILL OCCURRED FOR A LITTLE OVER A WEEK BEFORE THE VEHICLE COMPLETELY SHUT OFF WHILE GOING 60 MPH DOWN THE ROAD. LUCKILY WE WERE ABLE TO GET THE VEHICLE TO THE SHOULDER BEFORE BEING IN AN ACCIDENT. THE VEHICLE STARTED BACK UP AND CONTINUED TO BEHAVE THE SAME UNTIL ONE DAY THE VEHICLE WOULD NOT START ANY MORE AT ALL. NOW WHAT HAPPEN WAS THE TIPM WAS CAUSING THE FUEL PUMP TO STAY ON ALL THE TIME AND THUS DRAINED THE BATTERY, AND NOW THE VEHICLE WILL NOT START AT ALL. THE VEHICLE IS JUST OVER TWO YEARS OLD. TODAY WE CONTACTED THE CORPORATE OFFICE AND WERE TOLD, THEY WERE NOT EVEN SUPPOSE TO LET US DRIVE THE VEHICLE OFF THE LOT WITH THE TIPM BEING BAD. WE HAVE WAITED OVER 10 WEEKS FOR A REPLACEMENT PART AFTER THEY HAVE ALREADY TAKEN THE MONEY AND WERE TOLD TODAY BY CORPORATE THAT OVER +1000 OF THE TIPMS ARE ON BACK ORDER WITH NO EXPECTED DATE OF DELIVERY. THIS IS ABSOLUTELY RIDICULOUS THAT A PART LIKE THIS WOULD GO OUT ON A TWO YEAR OLD VEHICLE. THIS DEFINITELY NEEDS TO BE MADE A MANDATORY RECALL AND REIMBURSEMENT BY THE CHRYSLER CORPORATION.

**Date Complaint Filed: 10/02/2013**

        **Date of Incident:** 09/01/2013

        **NHTSA ID Number:** 10546506

        **Vehicle:** 2011 Dodge Durango

        **Crash:** No        **Fire:** No        **Number of Injuries:** 0        **Number of Deaths:** 0

        **VIN:** 1D4RD2GG3BC...

        **SUMMARY:**

        BATTERY LIGHT CAME ON. MADE AN APPOINTMENT FOR SERVICE. NEVER MADE APPOINTMENT DATE. A/C WENT OUT, AIRBAG LIGHT CAME ON, RADIO STOPPED, LIGHTS FLASHED, WINDSHIELD WIPERS STARTED. CAR STALLED OUT WHILE DRIVING 30 MPH, LOST POWER STEERING. NO CRASH, ROLLED TO A SAFE STOPPING AREA. CAR WAS TOWED TO DEALER. DEALER SAID THE CAR NEEDED NEW BATTERY. NEW BATTERY WAS INSTALLED BUT CHECK BATTERY LIGHT WAS STILL ON. AFTER MORE TESTING, DEALER SAID ALTERNATOR NEEDED TO BE REPLACED. NEW ALTERNATOR WAS INSTALLED, BUT BATTERY LIGHT WAS STILL ON. DEALER PUT CALLS TO CHRYSLER. CHRYSLER SAID POSSIBLE BAD NEW ALTERNATOR REPLACE WITH ANOTHER NEW ALTERNATOR SUGGESTED. NEW ALTERNATOR REPLACED BUT SAME THING STILL HAPPENED, CHECK BATTERY LIGHT STILL ON. AFTER MORE CALLS TO CHRYSLER, NEW PCM (POWERTRAIN CONTROL MODULE) SUGGESTED TO BE INSTALLED. PCM WAS REPLACED AS WARRANTY PART, NO CHECK BATTERY LIGHT. ***TOTAL COST OF ABOUT $1,000.00 FOR OUT OF WARRANTY PARTS. WITHIN A WEEK CAR WAS NOT STARTING***, WOULD CRANK BUT ENGINE WOULD NOT START OR IT WOULD START AND THEN STALL OUT, CAR WOULD FINALLY START AFTER 20 MINS. OF TRYING TO START CAR. THIS HAPPENED SEVERAL TIMES.  TOOK CAR BACK TO DEALER. SOFTWARE UPDATE WAS DONE. STILL HAD STARTING ISSUES, AND RUNNING ISSUES. ***AFTER MORE CALLS TO CHRYSLER THEY NOW BELIEVE THE ISSUE IS A TIPM*** (TOTALLY INTEGRATED POWER MODULE). TIPM IS ON A NATIONAL BACK ORDER WITH NO KNOWN RELEASE/ EXPECTED AVAILABILITY DATE. CHRYSLER WILL WARRANTY THE TIPM PART.  CAR NOW SITS AT THE DEALER FOR ***ALMOST 30 DAYS AND NO ONE HAS ANY ESTIMATE AS TO A FIX DATE.*** NOW WAITING ON A CASE MANAGER TO CONTACT ABOUT THIS ISSUE AND POSSIBLE RENTAL CAR AND REFUND FOR REPLACED PARTS.  SENDING OFF PAPER WORK FOR LEMON LAW.  ***CHRYSLER SHOULD ISSUE RECALL BUT OBVIOUSLY WILL NOT DUE TO LACK OF INVENTORY IN TIPM PARTS.***

The above complaint describes, among other things, stalling caused by a defective TIPM

in a 2011 Dodge Durango—the same vehicle that Plaintiff Garcia owns.  And this complaint was

submitted to NHTSA approximately four months *before* Plaintiff Garcia purchased his vehicle.

**Date Complaint Filed: 12/18/2013**
        **Date of Incident:** 12/09/2013
        **NHTSA ID Number:** 10556461
        **Vehicle:** 2007 Dodge Nitro 4x4
        **Crash:** No      **Fire:** *<u>Yes</u>*      **Number of Injuries:** 0      **Number of Deaths:** 0
        **VIN:** 1D8GU58627W...
        **SUMMARY**

        I STARTED THE CAR TO MOVE IT IN THE DRIVEWAY.  AFTER
BACKING UP, I PUT IT IN PARK.  I THEN TRIED TO PLACE IT IN DRIVE, AND
THE SHIFTER LOCK WOULDN'T RELEASE. (IT NORMALLY RELEASES WHEN
THE BRAKE PEDAL IS DEPRESSED.)  AFTER A FEW TRIES, I ATTEMPTED TO
TURN OFF AND RESTART THE CAR. WHEN I TURNED THE IGNITION TO
RESTART THE CAR, ALL THE ELECTRONICS ACTIVATED, THE HEADLIGHTS
WERE FLASHING, THE HORN WAS CYCLING, THE WIPERS AND SPRAYERS
WERE RUNNING, ETC. I TURNED OFF THE IGNITION AND POPPED THE HOOD
RELEASE.  WHEN I GOT OUT AND WALKED TO THE FRONT OF THE
VEHICLE, I NOTICED LIGHT COMING FROM THE HOOD GAP. ***<u>WHEN I
OPENED THE HOOD, FLAMES WERE SURROUNDING ALL SIDES OF THE
TIPM UNIT, AND THE HOOD INSULATION LINER WAS ON FIRE.</u>***  I
DISCONNECTED THE BATTERY AND WAS ABLE TO EXTINGUISH THE FIRE.

**Date Complaint Filed: 02/10/2014**
        **Date of Incident:** 01/18/2014
        **NHTSA ID Number:** 10563677
        **Vehicle:** 2012 Chrysler Town & Country
        **Crash:** No      **Fire:** No      **Number of Injuries:** 0      **Number of Deaths:** 0
        **VIN:** 2C4RC1BG0CR...
        **SUMMARY:**

        AS I WAS COMING HOME FROM WORK AT NIGHT ON JANUARY 18TH
2014 ***<u>MY LIGHTS ON MY 2012 CHRYSLER TOWN AND COUNTRY WENT OUT
FOR A COUPLE OF SECONDS AND THAN CAME BACK ON</u>***. I WAS GOING
70MPH ON THE HIGHWAY AND VERY THANKFUL THAT I DID NOT CRASH
BECAUSE OF THIS. I TOOK MY VAN IN AND FOUND IT OUT IT IS THE

TOTALLY INTEGRATED POWER MODULE. THE PART I NEED IS ON BACK ORDER AND NO ONE HAS AN ETA. I HAVE BEEN WITHOUT MY VEHICLE SINCE JANUARY 29, 2014. I HAVE BEEN IN CONTACT WITH CHRYSLER AND THEY SAY THAT THERE IS NOTHING THEY CAN DO AND BASICALLY THEY ARE NOT RESPONSIBLE FOR THE DEFECT PART. I HAVE BEEN IN CONTACT WITH MULTIPLE DEALERSHIPS AND THIS HAS NOT BEEN AN ISOLATED INCIDENT. DEALERSHIPS HAVE SEEN MULTIPLE INCIDENTS ON THE TIPM. THE PART IS ON NATIONAL BACK ORDER, SO THAT ALSO RAISES A RED FLAG. I HAVE DONE SOME RESEARCH ON THIS AND HAVE FOUND OUT THIS HAS BEEN GOING ON FOR MANY YEARS. I'M NOT UNDERSTANDING WHY CHRYSLER IS NOT BEING HELD RESPONSIBLE FOR THIS DEFECTIVE PART. HOW MANY PEOPLE HAVE TO GET HURT BEFORE SOMETHING IS DONE. THERE IS A CLASS ACTION LAWSUIT AGAINST CHRYSLER FOR THE TIPM. WHAT MORE NEEDS TO BE PROVED THAT THERE IS A SIGNIFICANT DEFECT WITH THIS PART AND HAVE CHRYSLER HELD RESPONSIBLE? ***THE DEALERSHIP WHERE MY VAN IS STATED TO ME THAT THE TIPM HAS MADE MY VEHICLE UNSAFE TO DRIVE***. WHY DOES THIS NOT SCREAM SAFETY RECALL??

**Date Complaint Filed: 02/20/2014**

**Date of Incident:** 02/16/2014
**NHTSA ID Number:** 10565069
**Vehicle:** 2011 Dodge Nitro
**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0
**VIN:** 1D4PT2GK6BW...
**SUMMARY:**

I PURCHASED THIS VEHICLE IN NOVEMBER 2013, UNAWARE THAT THERE WAS A RECALL ON THE TIPM. HERE IT IS A FEW MONTHS LATER AND MY VEHICLE BREAKS DOWN. I HAD IT TOWED TO THE DEALERSHIP. THEY TOLD ME DIAGNOSTIC AND A CHECK UP WAS DONE AND THEY COULDN'T FIND ANYTHING WRONG. THE VEHICLE STARTED RIGHT UP. I PICKED UP MY TRUCK TUESDAY 02/18/2014. I LIVE LESS THEN 2 MILES FROM THE DEALERSHIP. WHEN I GOT HOME THE VEHICLE WOULD NOT START. CALLED DEALERSHIP BACK STATED TO WAIT 30 MINUTES AND TRY TO RESTART IT. I ENDED UP WAITING AN HOUR BEFORE IT COULD START AND TOOK IT BACK TO ED VOYLES. THEY RAN A DIAGNOSTIC IN FRONT OF ME. THE TRUCK WOULDN'T START SO THEY PUSHED IT INTO REPAIR SHOP. I RECEIVED A CALL THE NEXT DAY STATING IT WAS THE TIPM. THE CHARGE WAS 1,030.00 AND 117.00 FOR RUNNING TEST. I DECIDED

TO RESEARCH THE VEHICLE ONLY TO FIND OUT THERE WAS A RECALL FOR THAT PART. I CALLED DODGE @ 800-247-9753 ON 02/20/2014 SPOKE TO REP SHE STATED THERE WAS A RECALL BUT MY VEHICLE VIN# WAS NOT APART OF THE RECALL. I INFORMED HER THAT THEY SHOULD HAVE RECALLED ALL THE VEHICLES BECAUSE ITS THE SAME EXACT ISSUE. SHE STATED THEY COULD NOT REPAIR THE VEHICLE AND MY WARRANTY WILL NOT COVER IT. *TR

**Date Complaint Filed: 03/19/2014**

**Date of Incident:** 03/02/2014

**NHTSA ID Number:** 10573471

**Vehicle:** 2012 Dodge Ram 5500

**Crash:** No          **Fire:** *Yes*          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:** 3C7WDNDL3CG...

**SUMMARY:**

ON MARCH 2, 2014 WHILE SITTING IN OUR 2012 DODGE 5500 4 X 4 THE LOW FUEL LIGHT CAME ON AND *WE OPENED HOOD AND TIPM WAS SMOKING AGAIN. WE JUST GOT THE TRUCK BACK FROM THE DEALER FROM THE FIRST TIPM FIRE 4 DAYS BEFORE.*   I JUMPED OUT OF THE TRUCK AND DISCONNECTED THE BATTERIES AND FLED FROM HARMS WAY.

**Date Complaint Filed: 05/20/2014**

**Date of Incident:** 05/09/2014

**NHTSA ID Number:** 10592802

**Vehicle:** 2012 Dodge Durango

**Crash:** No          **Fire:** *Yes*          **Number of Injuries:** *2*          **Number of Deaths:** 0

**VIN:** 1C4SDJCT9CC...

**SUMMARY:**

OUR 2012 DODGE DURANGO R/T WAS PURCHASED BRAND NEW AS A REPLACEMENT FOR LEMON LAW BUY BACK OF OUR 2009 DODGE JOURNEY.  THE DURANGO IS PLAGUED WITH DESIGN FLAWS.  THE MOST OBVIOUS IS THE TIPM TOTAL INTEGRATED MODULE*, THE FAILURE OF THIS MODULE RESULTING IN OUR VEHICLE CATCHING FIRE.*  THE VEHICLE CRANKS BUT DOES NOT START AT TIMES, OTHER TIMES WHEN IT STARTS IT DIES IN THE STREET.  WHILE TAKING IT TO THE DEALERSHIP FOR REPAIRS THEY WOULD NOT REPAIR IT AND ANOTHER DEALER DENIED THE REPAIRS.  THE ONLY LOANER I WAS PLACED IN WAS A BRAND NEW DURANGO WITH THE PLASTIC STILL COVERING THE SEATS, FLOOR

ETC.  THE BRAND NEW LOANER ALSO CONTAINED A FAULTY TIPM.  WE DIDN'T EVEN HAVE THE LOANER A DAY BECAUSE THE LIGHTS WERE BRIGHT LIGHTING EVERYONE, ALARM WAS GOING OFF DRIVING DOWN THE ROAD, RADIO WAS CRACKLING, THE INSTRUMENT PANEL WAS FLASHING.  OUR DURANGO CONTAINS ALL OF THESE ISSUES; LEFT AND RIGHT REAR TAIL LIGHT ASSEMBLIES ARE DEAD, BOTH FRONT STRUTS ARE BLOWN LEAKING, SPRAYING FLUID UNDER THE VEHICLE ONTO THE FRAME AND BRAKE(S), LINE(S), TRANSMISSIONS IS LEAKING, HIGH ENGINE OIL CONSUMPTION.  OUR DURANGO IS STILL UNDER FACTORY WARRANTY, PLUS A PLATINUM EXTENDED WARRANTY.  WHILE OUR VEHICLE IS COVERED UNDER AN EXTENDED WARRANTY THEY WILL NOT PAY FOR A RENTAL CAR BECAUSE THE TIPM IS NATIONAL BACKORDERED PART.  PLEASE.... ***YOU HAVE TO RECALL THIS VEHICLE BEFORE OTHERS ARE INJURED OR KILLED!***

**Date Complaint Filed: 08/20/2014**

**Date of Incident:** 06/13/2014

**NHTSA ID Number:** 10626936

**Vehicle:** 2010 Dodge Grand Caravan

**Crash:** No            **Fire:** No       **Number of Injuries:** 0       **Number of Deaths:** 0

**VIN:** 2D4RN5D11AR...

**SUMMARY:**

THE CONTACT STATED THAT THE VEHICLE STALLED WITHOUT WARNING ON MULTIPLE OCCASIONS.  ***WHILE DRIVING 40 MPH, THE CONTACT TOUCHED THE IGNITION AND THE VEHICLE STALLED.***  THE VEHICLE WAS ABLE TO BE RESTARTED. IN ADDITION, THE INSTRUMENT PANEL WARNING INDICATORS AND GAUGES FAILED AT RANDOM.  WHILE DRIVING AT NIGHT, THE HEADLIGHTS FLICKERED AND FAILED TO ILLUMINATE OCCASIONALLY.  ***AN INDEPENDENT MECHANIC INSPECTED THE VEHICLE AND STATED THAT THE TIPM NEEDED TO BE REPLACED.*** THE FAILURE MILEAGE WAS 77,431.

**Date Complaint Filed: 08/22/2014**

**Date of Incident:** 07/06/2014

**NHTSA ID Number:** 10627366

**Vehicle:** 2011 Dodge Grand Caravan

**Crash:** No            **Fire:** No       **Number of Injuries:** 0       **Number of Deaths:** 0

**VIN:** 2D4RN3DG0BR...

**SUMMARY:**

*__THE CAR STALLED AND STEERING BECAME VERY DIFFICULT
WHILE DRIVING ON THRUWAY__*... I WAS ABLE TO GET CAR TO SIDE OF
ROAD AND IT STARTED BACK UP BUT IT WAS PRETTY SCARY EVENT - I
HAD MY THREE DAUGHTERS 2, 4 & 6 YEARS OLD IN THE CAR AT THE TIME.
THIS HAS HAPPENED BEFORE ... *__I TOOK IT INTO THE DEALER 6 WEEKS AGO
AND WAS INFORMED THAT THE TIPM IS DEFECTIVE AND THAT THEY ARE
ON BACK ORDER__*—NO ETA ON REPAIR.  I QUICK INTERNET SEARCH
REVEALS QUITE A FEW PEOPLE WITH SIMILAR CARAVAN PROBLEMS...

**Date Complaint Filed: 09/02/2014**

**Date of Incident:** 08/15/2014

**NHTSA ID Number:** 10630164

**Vehicle:** 2011 Chrysler Town & Country

**Crash:** No          **Fire:** No          **Number of Injuries:** 0          **Number of Deaths:** 0

**VIN:** 2A4RR5DG2BR...

**SUMMARY:**

THE ISSUES WITH MY 2011 CHRYSLER TOWN AND COUNTRY BEGAN
AS A SERIES OF ODD "QUIRKS": THE RADIO AS WELL AS THE ELECTRONIC
AC AND ELECTRIC WINDOWS WOULD ALL FUNCTION AS IF THEY HAD A
MIND OF THEIR OWN; FREQUENTLY POWERING ON AND OFF OR
ADJUSTING WHILE DRIVING.  IT WAS CERTAINLY MORE OF A NUISANCE
THAN SAFETY RISK. WITHIN THE LAST 2–3 WEEKS, WE HAVE HAD SEVERE
ISSUES IN STARTING THE CAR ALTOGETHER. *__THAT PROMPTED A VISIT TO
OUR CHRYSLER DEALERSHIP WHO DIAGNOSED A FAULTY TIPM__* (TOTAL
INTEGRATED POWER MODULE). THE FIX ALONE IS MAJOR AND WILL COST
IN EXCESS OF $1,000, ALL ON A LESS THAN THREE YEAR OLD CAR.  WE ARE
FURTHER HINDERED BY THE FACT THAT THE PART IS BACK-ORDERED FOR
SEVERAL WEEKS, AND THE MECHANIC EXPLAINED IT COULD EVEN BE
"MONTHS DUE TO PARTS SHORTAGES FROM AN EXCESSIVE NUMBER OF
REPLACEMENTS TAKING PLACE ACROSS THE COUNTRY."  HE SAID WE
COULD DRIVE IT IN THE MEANTIME BUT AFTER RESEARCHING THIS ISSUE
ONLINE AND SEEING INCIDENTS OF AIRBAGS RANDOMLY DEPLOYING
AND CARS SHUTTING OFF WITHOUT NOTICE WHILE IN MOTION, I AM NOT
COMFORTABLE DRIVING IT. IT APPEARS THIS IS AN ISSUE CHRYSLER IS
WELL AWARE OF BUT THIS SHOULD RESULT IN AN ALL OUT RECALL, NOT
AN INTERNALLY LEAD [*sic*] INVESTIGATION.

103.    Chrysler's knowledge of the TIPM defect is also demonstrated by the fact that Chrysler studied and tracked TIPM-related issues through exhaustive pre-release testing. In recent years, Chrysler has tested models for millions of miles before their release. For example, Chrysler employees put seven million miles on multiple 2011 Jeep Grand Cherokee test vehicles before production. Given the speed and frequency with which the TIPM defect manifests, it is not plausible that this testing would not have alerted Chrysler to the existence of the TIPM defect. Only Chrysler, however, has access to its pre-release testing data.

104.    Chrysler also receives data about how its vehicles are performing in the days, weeks, and months after they are sold. Chrysler collects information from both drivers and dealerships, including through complaints, warranty claims, replacement parts data, and other aggregated data sources. Chrysler has exclusive access to this information also.

105.    Chrysler is collecting old TIPM parts that have been replaced, in an effort to keep those parts away from public scrutiny. Chrysler is requiring anyone who wants to purchase a new TIPM from Chrysler to agree to return to Chrysler the old TIPM that is being replaced. This requirement affects non-Chrysler mechanics and private individuals who seek to keep the original TIPM parts for any reason, including but not limited to examining those parts for defects. In addition, the owners of these vehicles already have paid for the original TIPM parts, and should not have to give up their personal property in order to buy a replacement part; this amounts to an abusive tactic.

**Chrysler's Failure to Disclose the Defect**

106.    Chrysler has actively concealed, and continues to conceal, its knowledge concerning the defective TIPM.

107.   Chrysler has never disclosed the TIPM defect to drivers or potential purchasers or lessees of Class Vehicles.

108.   Chrysler has never instructed its dealerships to disclose the TIPM defect to drivers or potential purchasers or lessees of Class Vehicles.

109.   The TIPM defect was not known or reasonably discoverable by Plaintiffs and proposed class members before purchase or lease, or without experiencing the defect first-hand, thereby exposing themselves to an unreasonable safety risk.  Only Chrysler had all of the relevant information and, given Chrysler's advanced technical knowhow and understanding of its own vehicles, Chrysler knew or should have known—in light of all the data available exclusively to it—that the TIPM in all the Class Vehicles was defective.

110.   Chrysler has remained silent even as it issued internal technical service bulletins, conducted internal investigations, performed limited TIPM-related recall repairs, saw the TIPM replacement parts go on national backorder, and was aware of hundreds of complaints for Class Vehicles lodged with NHTSA.

111.   Chrysler's refusal to acknowledge publically the defect has created widespread confusion.  Chrysler's failure to notify consumers, dealerships, and auto service technicians prevents the TIPM defect from being efficiently diagnosed.  Drivers often do not realize that the problems they experience occur because of the TIPM defect or that prompt action is necessary to ensure that they do not experience stalling, headlight failure, or other dangerous symptoms in the future.  Likewise, the lack of information makes it less likely that dealerships and service technicians will be able to diagnose and fix the TIPM defect or advise Class members about the dangers of driving Class Vehicles.

112.    As a result of Chrysler's inaction and silence, many consumers are unaware that they purchased and continue to drive unsafe and unreliable vehicles.  As Chrysler knows, a reasonable person would consider the TIPM defect material and would not purchase or lease a vehicle equipped with a defective TIPM were the defect disclosed in advance, or they would pay substantially less for the vehicle.

113.    Many purchasers and lessees of Class Vehicles have spent hundreds or thousands of dollars on TIPM repairs as well as unnecessary repairs performed as a result of the confusion created by Chrysler's silence, including repairs and replacements of batteries, fuel pumps, and wireless ignition modules.  Some have even spent over $2,000 replacing their fuel pump only to later learn that the problem is actually with the TIPM—a repair that typically costs more than $1,000.  Many have incurred towing costs and a number of those who have had to wait for a repair due to the nationwide TIPM parts shortage have spent money on alternative transportation, such as a rental car or public transportation.

114.    Adding insult to injury, after consumers spend significant sums to replace the defective TIPM, Chrysler cannot assure them that the replacement TIPM is not similarly defective.

115.    To this day, Chrysler remains unwilling to notify Class Vehicle owners and lessees about the TIPM defect or assist them with the cost of the resulting repairs.

**Chrysler's Warranties to Plaintiffs and the Class Members**

116.    As purchasers and lessees, Plaintiffs and the Class members received from Chrysler a Basic Limited Warranty.  The following is what is covered under the Basic Limited Warranty:

The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and Unwired headphones. You pay nothing for these repairs. These warranty repairs or adjustments — including all parts and labor connected with them — will be made by your dealer at no charge, using new or remanufactured parts.

117.    The Basic Limited Warranty lasts for 36 months from the date it begins or for 36,000 miles on the odometer, whichever occurs first.

118.    The Basic Limited Warranty also provides as follows:

The warranties contained in this booklet are the only express warranties that Chrysler Group LLC ("Chrysler") makes for your vehicle. **These warranties give you specific legal rights. You may also have other rights that vary from state to state.** For example, you may have some implied warranties, depending on the state where your vehicle was sold or is registered.  These implied warranties are limited, to the extent allowed by law, to the time periods covered by the express written warranties contained in this booklet.

\* \* \*

**Some states do not allow limitations on how long an implied warranty lasts, so the above limitations may not apply to you.**

119.    In addition, in certain instances, certain Plaintiffs and other members of the Class purchased extended warranty plans from the Dealers, referred to as "Vehicle Protection Plans." The Vehicle Protection Plans extended the original warranty to cover up to 100,000 miles and provide varying coverage depending on the coverage level chosen.  The Vehicle Protection Plans included "Silver Coverage," "Gold Coverage," "Gold Plus Coverage" or "Platinum" plans. These extended warranties covered electrical components within Class Vehicles, including the TIPM.

120. Moreover, certain Plaintiffs and other members of the Class purchased or leased Class Vehicles as Chrysler Group Certified Pre-Owned Vehicles, which "must pass a stringent certification process that guarantees only the finest late model vehicles get certified. Every vehicle that passes is then subject to a comprehensive 125-point inspection and a thorough reconditioning process . . . ." The 125-point inspection covers many components within the Class Vehicles that are run by or connected with the TIPM, including the air bag system, horn, headlamps, turn signals, door locks, windows, windshield wiper system and door locks.

121. "For even more peace of mind," for its Certified Pre-Owned Vehicles Chrysler added the "3-Month/3,000-Mile Maximum Care Coverage," which "[r]uns from the date of the [Certified Pre-Owned Vehicle] sale, or the expiration of the remaining 3/36 Basic New Vehicle Warranty (whichever is more beneficial to the customer)." The Maximum Care Coverage "covers most vehicle components (over 5,000)," including the TIPM. In addition, Chrysler offers "Available Lifetime Certified Warranty Upgrades" for Certified Pre-Owned Chrysler, Jeep, Dodge or Ram vehicles, "a warranty that will cover your [Certified Pre-Owned Vehicle] for as long as you own it!" The latter also covers the TIPM.

122. As set forth more fully below, Chrysler breached the above warranties by selling or leasing to Plaintiffs and the other Class members Class Vehicles that are defective in material, workmanship or factory preparation and by failing to repair or adjust the defect free of charge to Plaintiffs and the other Class members.

123. Plaintiffs and the other Class members reasonably expected that the Class Vehicles they purchased and leased were free of defects.

124.     In addition, Plaintiffs and the Class members have had sufficient direct dealings with either Chrysler or its agent dealerships to establish privity of contract between Chrysler, on one hand, and Plaintiff and the Class Members, on the other hand.  Plaintiffs and the Class members are the intended beneficiaries of Chrysler's express and implied warranties.  The dealerships were not intended to be the ultimate consumers of the subject vehicles, and have no rights under the warranty agreements provided by Chrysler.  Chrysler's warranties were designed for and intended to benefit only the consumers.

## PLAINTIFFS' EXPERIENCES

### Plaintiff Franklyn Cabrera Garcia

125.     Plaintiff Garcia purchased a certified pre-owned 2011 Dodge Durango on March 18, 2014 from Eastchester Chrysler Jeep Dodge, 4007 Boston Road, Bronx, New York 10466 ("Eastchester Chrysler").  Plaintiff Garcia decided to purchase the vehicle in early February 2014.  He made cash deposits to Eastchester Chrysler, constituting his down payment, on February 2, February 19, and March 18, 2014.  He executed the sales contract on March 18, 2014.

126.     Plaintiff Garcia chose the Dodge brand because of its reputation as a large American company that makes safe, durable, and reliable cars.   He specifically chose the Durango because, based in part on advertisements he viewed beginning in 2011, he believed it was safe, durable, reliable, and sufficiently large and comfortable for his family.

127.     At no point during Plaintiff Garcia's conversations with the staff at Eastchester Chrysler in January, February, and March 2014 did the staff disclose the material facts about the TIPM defect to Plaintiff Garcia.  By this time, Chrysler was aware of the TIPM defect.

128.    When Plaintiff Garcia purchased his vehicle, he relied on the non-disclosure of the TIPM defects.  Chrysler's concealment of the material defect information induced him to purchase the vehicle.  Had he been aware of the TIPM defects, he would not have purchased the vehicle.

129.    When Plaintiff Garcia purchased his vehicle, he reasonably expected that the TIPM was designed to last for the useful life of the vehicle without the need for replacement and that his vehicle did not pose an unavoidable safety risk.

130.    Because Chrysler knew about the TIPM defects well before Plaintiff Garcia purchased his car, yet concealed those defects from the public and from government regulators, Plaintiff Garcia was deprived of material information necessary to make a reasonably informed choice about whether to purchase a used 2011 Dodge Durango.  Therefore, Chrysler's decision to conceal this material information directly influenced Plaintiff Franklin's purchase decision.  Plaintiff Franklin reasonably, justifiably, and detrimentally relied on Chrysler's failure to disclose material safety information about his vehicle.

131.    Shortly after purchasing his Durango—within the Maximum Care Coverage warranty period—Plaintiff Garcia began experiencing multiple problems.  The vehicle would not start consistently, and stalled repeatedly and unexpectedly.  On the day of purchase, it stalled on the highway while travelling at 50 mph.  His wife and children were in the vehicle, and a large truck almost rear-ended them because of the Durango's sudden slow-down.  The next day, the vehicle stalled while making a right turn at low speed.  The vehicle also experienced numerous electrical issues, including but not limited to: the sunroof and windows failing to open or close

properly, the headlights failing to turn on, and the fuel pump continuing to run after the car had been shut off. On numerous occasions the front end of the car would emit smoke.

132. During the first week Plaintiff Garcia owned the vehicle, the transmission made various clicking and whirring noises. He promptly returned to the dealership, who fixed the transmission under warranty without costs to Plaintiff Garcia. After the attempted repair, however, the transmission made loud banging noises when Plaintiff Garcia pushed on the brakes. He returned to the dealer again, who said that that the vehicle was fine and that no diagnostic codes appeared upon inspection.

133. To attempt to understand the recurring problem of the fuel pump continuing to run after the ignition was switched off, Plaintiff Garcia took his vehicle to a private mechanic. The mechanic ran a diagnostic exam on the car and pulled a list of repair codes from the vehicle's computer. Plaintiff Garcia then returned to the dealer, who told him his vehicle was fine, aside from the fuel pump, and that it would cost $2,500 to fix the fuel pump. During this visit Plaintiff Garcia informed the dealer of the entire universe of electrical problems that he had been suffering. Yet the dealer failed to run any diagnostic tests of the electrical system or investigate the electrical problems.

134. In or around August 2014, Plaintiff Garcia noticed smoke coming from the fuse box located under his vehicle's hood. He called the dealer, who promised him a return phone call that never happened.

135. Shortly before the day of the fire, Plaintiff Garcia went to dealer and asked for a different car. The dealer seemed cooperative, and said Plaintiff Garcia needed to leave his car overnight. He acquiesced and took a taxi home, missing work that day. The next day, he

returned and the Dealer said that his credit was insufficient to obtain a different car.  Plaintiff Garcia believes this was all a big ruse to placate him.

136.    On September 5, 2014, Plaintiff Garcia was driving and noticed smoke coming from the glove compartment and A/C ducts.  The doors automatically locked and Plaintiff Garcia was momentarily trapped.  Smoke filled the passenger compartment and flames began to rise from under the floor on the passenger side.  Shortly thereafter, the entire vehicle was engulfed in flames.  The vehicle was destroyed beyond repair and was deemed a total loss. Plaintiff Garcia suffered burns on his right arm.

137.    Throughout Plaintiff Garcia's ownership of his vehicle, he frequently incurred the cost of hiring a taxi to jump start his battery due to the malfunctioning fuel pump, costing him about $10 per instance.  Plaintiff Garcia also replaced the vehicle's battery, for about $120.  On numerous occasions, Plaintiff Garcia required towing services.  On one occasion, he spent $560 to be towed home after stalling out during a return drive from Connecticut.  After the fire destroyed his Durango on September 5, 2014, Plaintiff Garcia paid for his vehicle to be towed and has been paying a daily storage fee to the towing company.

138.    After the fire, Plaintiff Garcia returned to the dealership to explain what had happened and to seek some form of relief.  A manager sat him down and told him to wait a moment.  After an unreasonably long period, no one returned to speak with Plaintiff Garcia and he left the dealership.

139.    In the approximately nine weeks since the fire on September 5, 2014, Plaintiff Garcia has incurred the costs of public transportation and taxis for himself, his pregnant wife, and for his children to get back and forth from school (among other errands and necessary

travels).  Additionally, Plaintiff Garcia had to change jobs in order to work closer to home.  These harms are the direct and foreseeable consequence of the sudden loss of his vehicle because of an electrical fire caused by the TIPM defect.

140.  Plaintiff Garcia received the interim notice sent to vehicle owners informing him of the fuel pump relay recall (NHTSA safety recall 14V-530) *after* he suffered vehicle stalls and his car caught on fire.  This recall was initiated only two days before the vehicle fire.  The precise date of Chrysler's mailing of the interim notice is presently unknown to Plaintiff Garcia, but in a November 11, 2014 communication from Chrysler to NHTSA, Chrysler stated that it had completed the interim owner notification mailing on October 31, 2014—nearly two months *after* the vehicle fire.

141.  The aforementioned problems that Plaintiff Garcia's vehicle suffered show that the TIPM in his vehicle was defective, because of design defects, manufacturing defects, or both.

### Plaintiff Mindi Caron

142.  Plaintiff Caron purchased a certified pre-owned 2012 Jeep Liberty on March 14, 2014 from a Chrysler dealership in Rapid City, South Dakota.

143.  At no point during Plaintiff Caron's conversations with the staff at the Chrysler dealership prior to or at the time of purchase did the staff disclose the material facts about the TIPM defect to her.

144.  When Plaintiff Caron purchased her vehicle, she relied on a reasonable expectation that the TIPM was designed to last for the useful life of the vehicle without the need for replacement and she relied on a reasonable expectation that her vehicle did not pose an unavoidable safety risk.

145.    When Plaintiff Caron purchased her vehicle, she relied on the non-disclosure of the TIPM defects.  Chrysler's concealment of the material defect information induced her to purchase the vehicle.  Had she been aware of the TIPM defects, she would not have purchased the vehicle.

146.    Because Chrysler knew about the TIPM defects well before Plaintiff Caron purchased her car, yet concealed those defects from the public and from government regulators, she was deprived of material information necessary to make a reasonably informed choice about whether to purchase a used 2012 Jeep Liberty.  Therefore, Chrysler's decision to conceal this material information directly influenced Plaintiff Caron's purchase decision.  She reasonably, justifiably, and detrimentally relied on Chrysler's failure to disclose material safety information about her vehicle.

147.    In November 2014, Plaintiff Caron's adult daughter was using the car while away at college, and it repeatedly failed to start.  After jump-starting the vehicle, the door locks weren't working and the alarm went off.  Feeling unsafe in the vehicle, her daughter drove it home to Rapid City—a five-hour drive.  During this drive she was afraid to turn off the car for fear of it failing to start, and she had to engage in the dangerous task of pumping fuel at a gas station with the engine running.

148.    Shortly after her daughter returned with the vehicle, Plaintiff Caron took it to a Jeep dealership.  The dealership's staff informed her that the TIPM needed to be replaced, and she paid approximately $800 in parts and labor to make the repairs.  The dealership inexplicably blamed her daughter for the faulty TIPM, claiming she somehow destroyed it during the jump start.

149.    On January 10, 2015, Plaintiff Caron's daughter drove the car back to college, and after about three hours on the road the "EMCOFF" dashboard light and the "4wd" dashboard light came on.  The car stalled on one occasion right after she refueled it.

150.    On February 6, 2015, Plaintiff Caron's daughter brought the car back to Rapid City.  Again, after about three hours of driving the "EMCOFF" and "4wd" lights came on.

151.    On February 10, 2015, Plaintiff Caron returned to the Jeep dealership.  The dealership could not duplicate the issue and told her to return if those dashboard lights were to come on again.  Based on her experience, however, that would be impossible because those lights come on only after several hours of driving—typically in rural areas far from any car dealerships.

152.    Because Chrysler has not even admitted that the TIPM is defective, Plaintiff Caron reasonably believes that the replacement TIPM installed in her vehicle may have the same defects as the TIPM that came factory-equipped in her vehicle.

153.    The aforementioned problems that Plaintiff Caron's vehicle suffered show that the TIPM in her vehicle was defective, because of design defects, manufacturing defects, or both.

**Plaintiff Jay Probasco**

154.    Plaintiff Probasco purchased a certified pre-owned 2011 Jeep Grand Cherokee in June 2014 at Airpark Dodge Chrysler Jeep in Scottsdale, Arizona.

155.    At no point during Plaintiff Probasco's conversations with the staff at the Chrysler dealership prior to or at the time of purchase did the staff disclose the material facts about the TIPM defect to him.

156.    When Plaintiff Probasco purchased his vehicle, he relied on a reasonable expectation that the TIPM was designed to last for the useful life of the vehicle without the need for replacement and he relied on a reasonable expectation that his vehicle did not pose an unavoidable safety risk.

157.    When Plaintiff Probasco purchased his vehicle, he relied on the non-disclosure of the TIPM defects.  Chrysler's concealment of the material defect information induced him to purchase the vehicle.  Had he been aware of the TIPM defects, he would not have purchased the vehicle.

158.    Because Chrysler knew about the TIPM defects well before Plaintiff Probasco purchased his vehicle, yet concealed those defects from the public and from government regulators, he was deprived of material information necessary to make a reasonably informed choice about whether to purchase a used 2011 Jeep Grand Cherokee.  Therefore, Chrysler's decision to conceal this material information directly influenced his purchase decision.  He reasonably, justifiably, and detrimentally relied on Chrysler's failure to disclose material safety information about his vehicle.

159.    Within one month of the purchase—and thus within the Maximum Care Coverage warranty period for Chrysler certified pre-owned vehicles—Plaintiff Probasco began experiencing multiple problems with his vehicle.  The vehicle stalled in an intersection with his baby in the car, nearly causing an accident.  The fuel pump continues to run after the vehicle is turned off.  The vehicle  has numerous electrical problems; the power windows will not work intermittently, and there have been various instances where the engine turns over but will not

start.  Additionally, the remote start system shuts off intermittently, and the car often will not restart for ten to fifteen minutes.

160.    Plaintiff Probasco took his vehicle to a Chrysler dealership to analyze the problems.   The dealership charged him $118 for the diagnostic work.  The dealership  informed him that the vehicle needs a new TIPM, which costs $1,200, as well as a new fuel pump, which costs $500.  In addition, continual problems with the remote start system have required Plaintiff Probasco to replace the battery twice, at a cost of approximately $200 for each replacement. Plaintiff Probasco has parked his vehicle and has rented a temporary replacement car.

161.    The aforementioned problems that Plaintiff Probasco's vehicle suffered show that the TIPM in his vehicle was defective, because of design defects, manufacturing defects, or both.

### Plaintiff Lisa Tamburello

162.    Plaintiff Tamburello purchased a new 2011 Chrysler Town & Country on or about December 8, 2011 from Arrigo Dodge Chrysler Jeep Ram Sawgrass in Tamarac, Florida ("Arrigo Chrysler").

163.    At no point during Plaintiff Tamburello's conversations with the staff at Arrigo Chrysler prior to or at the time of purchase did the staff disclose the material facts about the TIPM defect to her.

164.    When Plaintiff Tamburello purchased her vehicle, she relied on a reasonable expectation that the TIPM was designed to last for the useful life of the vehicle without the need for replacement and she relied on a reasonable expectation that her vehicle did not pose an unavoidable safety risk.

165. When Plaintiff Tamburello purchased her vehicle, she relied on the non-disclosure of the TIPM defects. Chrysler's concealment of the material defect information induced her to purchase the vehicle. Had she been aware of the TIPM defects, she would not have purchased the vehicle.

166. Plaintiff Tamburello's vehicle was covered by TSB 08-053-11, which described and purported to remedy a TIPM defect causing failure to start and intermittent, unexpected alarm sounds. It is unknown whether the repair described in this TSB was performed on Plaintiff Tamburello's vehicle during any of her visits to Chrysler dealerships.

167. Plaintiff Tamburello purchased an extended warranty valid for 7 years or 85,000 miles, whichever came first.

168. Because Chrysler knew about the TIPM defects well before Plaintiff Tamburello purchased her vehicle, yet concealed those defects from the public and from government regulators, she was deprived of material information necessary to make a reasonably informed choice about whether to purchase a new 2011 Chrysler Town & Country. Therefore, Chrysler's decision to conceal this material information directly influenced her purchase decision. She reasonably, justifiably, and detrimentally relied on Chrysler's failure to disclose material safety information about his vehicle.

169. Plaintiff Tamburello suffered at least six incidents because of the TIPM defect, all of which occurred during her extended warranty period:

> a. On the first occasion, only one week after Plaintiff Tamburello purchased her vehicle, and with only 170 miles on the vehicle, Arrigo Chrysler tested and replaced the TIPM after she complained that the remote start feature was not working with either of the two remote control fobs. Arrigo Chrysler did not charge for this work.

b.      On the second occasion, in November 2013 and with approximately 34,640 miles on the vehicle, she started the car and almost immediately the car began to click loudly and the lights flashed on and off.  In her words, the car went "haywire."  The only way to stop this erratic, unexpected vehicle behavior was to disconnect the battery.  She reconnected the battery and the car started without a problem.  The next day she took the car to AutoNation Chrysler Dodge Jeep Ram Pembroke Pines ("AutoNation Chrysler"); there, she was told that disconnecting the battery erased the onboard computer and any error codes that may have been recorded.  No repairs were performed.

c.      On the third occasion, in February 2014 and with approximately 35,625 miles on the vehicle, the Town & Country again went "haywire," but this time Plaintiff Tamburello did not disconnect the battery.  She called a tow truck to take her car to AutoNation Chrysler.  The dealership diagnosed a problem with the ignition switch and installed a new ignition switch under warranty.  This repair did not solve Plaintiff Tamburello's TIPM problems.

d.      On the fourth occasion, in July 2014, Plaintiff Tamburello's sister-in-law was driving the vehicle in Virginia when the car again made a clicking noise and went "haywire."  All of the lights, exterior and interior, flashed for a moment and then the car died completely.  A few hours later, Plaintiff Tamburello was able to start the car and she drove it to Dulles Chrysler in Leesburg, Virginia. The dealership diagnosed battery problem (even though jumper cables were not necessary to start the car) and charged her approximately $270 for a new battery. This repair was insufficient to prevent future TIPM problems, however.

e.      On the fifth occasion, in August 2014, Plaintiff Tamburello, her partner, and their two minor children were driving in a sanctuary in the Florida Keys.  It was pitch black and they were driving only 20 mph, the speed limit. Suddenly the car went "haywire" again—the lights started flashing and the car died in the middle of the road.  As the car was rolling to a stop—still in the middle of the road—none of the vehicle's electrical systems worked.  The hazard lights would not come on; the windows would not roll down; and the power door locks would not release.  Once the car stopped the windows worked and Plaintiff Tamburello and her partner were able to extract the children through the windows.  The children were terrified and crying.  Fortunately, an approaching car saw the stalled vehicle—even though it was pitch black—and stopped to help. Using a flashlight and the other car's headlights, Plaintiff Tamburello's partner disconnected and then reconnected the vehicle's battery.  The car then started without incident.  The next day they returned home, and the following day they took the vehicle to AutoNation Chrysler.  The vehicle had 49,893 miles at that

time.  The dealer told Plaintiff Tamburello that if an inspection turned up nothing, then she would have to pay for the inspection.  This upset her greatly because the dealer had her complaint and repair history in its computer and knew of the past troubles she had had with the vehicle.  After an inspection did indeed turn up nothing, she was able to convince them not to charge her.  The dealership refused to pay for a rental car.

      f.      On the sixth occasion, on December 26, 2014, Plaintiff Tamburello, her partner, and their two minor children were driving through mountains in North Carolina to visit a family member's cabin.  Again, without warning, the clicking noise returned, the lights flashed, and the car stalled.  Because this had happened several times before, Plaintiff Tamburello and her partner knew what to expect and were able to point the car toward the center of the road rather to avoid driving off the edge of the road and down a ravine.  Once the car stalls, it is virtually impossible to steer because the power steering fails.  It was pitch black and there was no cell coverage.  They saw an oncoming car and were terrified it would hit them, as the vehicle had stopped partially in the oncoming lane.  Plaintiff Tamburello held up her cell phone with the screen lit to get the other driver's attention.  Thankfully, this worked and he stopped.  Plaintiff Tamburello's vehicle started once the battery was disconnected and reconnected.  Plaintiff Tamburello took the vehicle to Ross Chrysler in Boone, North Carolina, with 56,315 miles on the vehicle.  The dealership could not find anything wrong with the car.  The dealership checked for TSBs or "star cases," found no TSBs, and found one "star case" for "installing ground wire and transmission range sensor for concern somewhat similar to issue."  The dealership would not do any further diagnostics without duplicating Plaintiff Tamburello's concerns.  Her children were terrified to drive in the vehicle for the return trip to Florida.  She and her family then borrowed another family member's car, in which Plaintiff Tamburello and the children rode, to trail the Town & Country driven by her partner.  They spent approximately $150 in gas because for the extra car and approximately $120 for a hotel room for one night.  Normally they make the trip from North Carolina to Florida in one day, but they were scared to drive the Town & Country at night because of the recurring stalls.  To begin this trip they drove from their home in Florida to North Carolina in one day.

170.    After all of these life-threatening troubles, caused by the defective TIPM, Plaintiff Tamburello felt she had no choice but to sell the car.  She traded it in to a Toyota dealership on January 6, 2015 for a Toyota Sienna vehicle.  She obtained $14,500 from the Toyota dealership.

She reasonably believed this dealership would properly diagnose the Town & Country's electrical/stalling problems because the dealership performs a 160-point inspection on all vehicles before they are resold.  She did not explain the vehicle's history of stalling to the dealership because she reasonably believed that the dealership had sufficient technical sophistication to discover and remedy the underlying mechanical and/or electrical problems.

171.    She refused to make a private party sale to an unsuspecting purchaser because of the repeated, unexpected, and terrifying stalls.  Had she explained these problems, she would not have been able to sell the car or she would have had to drastically reduce the sale price.  The TIPM defect therefore deprived Plaintiff Tamburello of a meaningful opportunity to sell the Town & Country to a private party.

172.    Private party sales typically are more lucrative for sellers than trade-ins, because the dealership accepting the traded-in car desires to sell it for a profit.  For example, according to the Nada Guide, the average trade-in price for a 2011 Chrysler Town & Country Wagon Touring L in the zip code where Plaintiff Tamburello resides is $14,125.  The "clean retail" price is $18,100.  Plaintiff Tamburello could have expected to receive the same relative price increase had she been able to sell her vehicle to a private party.

173.    Plaintiff Tamburello was in a nearly impossible situation.  She was terrified to drive her car because of repeated, unexpected stalls.  And she needed a safe vehicle for her and her family.  Yet she could not afford to simply park the Town & Country and buy another car, or rent another car for an indefinite amount of time.  She could not obtain necessary, safe transportation without selling or trading in her Town & Country, and she made a responsible

decision possible by trading it in to a dealership.  Chrysler created this problem by selling cars with defective TIPMs and concealing the defect.

174.    The aforementioned problems that Plaintiff Tamburello's vehicle suffered show that the TIPM in her vehicle was defective, because of design defects, manufacturing defects, or both.

**Plaintiff Nathan Taylor**

175.    Plaintiff Taylor purchased a used 2011 Chrysler Town & Country in February 2012 from the Live Oak Carmax dealership in San Antonio, Texas.

176.    At no point during Plaintiff Taylor's conversations with the staff at Live Oak Carmax prior to or at the time of purchase did the staff disclose the material facts about the TIPM defect to him.

177.    When Plaintiff Taylor purchased his vehicle, he relied on a reasonable expectation that the TIPM was designed to last for the useful life of the vehicle without the need for replacement and he relied on a reasonable expectation that his vehicle did not pose an unavoidable safety risk.

178.    When Plaintiff Danielson purchased his vehicle, he relied on the non-disclosure of the TIPM defects.  Chrysler's concealment of the material defect information induced him to purchase the vehicle.  Had he been aware of the TIPM defects, he would not have purchased the vehicle.

179.    Because Chrysler knew about the TIPM defects well before Plaintiff Taylor purchased his vehicle, yet concealed those defects from the public and from government regulators, he was deprived of material information necessary to make a reasonably informed

choice about whether to purchase a used 2011 Chrysler Town & Country.  Therefore, Chrysler's decision to conceal this material information directly influenced his purchase decision.  He reasonably, justifiably, and detrimentally relied on Chrysler's failure to disclose material safety information about his vehicle.

180.   In or around October 2013—within the three-year/36,000-mile warranty period of the Basic Limited Warranty—Plaintiff Taylor's vehicle began experiencing several problems such as the air conditioner turning on and off, the dashboard warning lights turning on and off, the windshield wipers turning on and off, and intermittent loss of acceleration power.

181.   Plaintiff Taylor took his vehicle to multiple dealerships in an effort to repair the problems.  Plaintiff Taylor took his vehicle to Ancira Chrysler Jeep Dodge in San Antonio; the dealership replaced the right cylinder head.  This repair, however, did not alleviate the problems with the vehicle.  Plaintiff Taylor took his vehicle to Carmax in San Antonio and Ingram Park Chrysler Jeep Dodge RAM in San Antonio for additional diagnostics and repairs.  Chrysler dealerships repeatedly told Plaintiff Taylor that the problems with his vehicle were caused by an on-going "software issue."  Plaintiff Taylor continues to experience problems with his vehicle, including a loss of acceleration power on hills.  Plaintiff Taylor has paid approximately $200 in taxes for rental cars supplied by the dealerships.

182.   The aforementioned problems that Plaintiff Taylor's vehicle suffered show that the TIPM in his vehicle was defective, because of design defects, manufacturing defects, or both.

## STATUTE OF LIMITATIONS

183.   Any applicable statutes of limitations have been tolled by Chrysler's knowing and active concealment, denial, and misleading actions, as alleged herein.  Plaintiffs and members of

the Class were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part.  Plaintiffs and members of the Class could not reasonably have discovered the true latent nature of the TIPM defect or any of the issues and facts alleged herein.

184.    Chrysler is under a continuous duty to disclose to Plaintiffs and members of the Class the true character, quality, and nature of the Class Vehicles, and to disclose the existence of the TIPM defect.  Chrysler knowingly, affirmatively, and actively concealed the true character, quality, and nature of the TIPM defect.  Plaintiffs and members of the Class reasonably relied upon Chrysler's knowing, affirmative, and active concealment.  Based on the foregoing, Chrysler is estopped from relying on any statutes of limitation as a defense in this action.

185.    The causes of action alleged herein did or will only accrue upon discovery of the latent TIPM defect, as a result of Chrysler's fraudulent concealment of the TIPM defect. Plaintiffs and members of the Class did not discover, and could not have discovered, through the exercise of reasonable diligence, the true nature of the TIPM defect.

## CLASS ALLEGATIONS

186.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

187.    The class that Plaintiffs seek to represent (the "Class") is defined as follows:

a.    All residents of the United States who purchased or leased a Class Vehicle equipped with a TIPM-7 (the "**Nationwide Class**").  Excluded from the Nationwide Class are Chrysler's officers, directors, and employees.

b.      All persons who purchased or leased a Class Vehicle equipped with a TIPM-7 in the State of Arizona (the "**Arizona Subclass**").  Excluded from the Arizona Subclass are Chrysler's officers, directors, and employees.

c.      All persons who purchased or leased a Class Vehicle equipped with a TIPM-7 in the State of Florida (the "**Florida Subclass**").  Excluded from the Florida Subclass are Chrysler's officers, directors, and employees.

d.      All persons who purchased or leased a Class Vehicle equipped with a TIPM-7 in the State of New York (the "**New York Subclass**").  Excluded from the New York Subclass are Chrysler's officers, directors, and employees.

e.      All persons who purchased or leased a Class Vehicle equipped with a TIPM-7 in the State of South Dakota (the "**South Dakota Subclass**").  Excluded from the South Dakota Subclass are Chrysler's officers, directors, and employees.

f.      All persons who purchased or leased a Class Vehicle equipped with a TIPM-7 in the State of Texas (the "**Texas Subclass**").  Excluded from the Texas Subclass are Chrysler's officers, directors, and employees.

188.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveals that the Classes should be expanded or otherwise modified.

189.    Plaintiffs reserve the right to establish subclasses as appropriate.

190.    This action is brought and properly may be maintained as a class action pursuant to the provisions of Federal Rules of Civil Procedure 23(a)(1)–(4) and 23(b)(1), (b)(2) or (b)(3) and satisfies the requirements thereof.

191.    **Community of Interest**:  There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

192.    **Numerosity**:  While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the Class is ascertainable based upon the records maintained by Chrysler.  At this time, Plaintiffs are

informed and believe that the Class includes thousands of members.  Therefore, the Class is sufficiently numerous that joinder of all members of the Class in a single action is impracticable under Federal Rule of Civil Procedure Rule 23(a)(1), and the resolution of their claims through the procedure of a class action will be to the benefit to the parties and the Court.

193.    **Ascertainability**:  Names and addresses of member of the Class are available from Chrysler's records.  Notice can be provided to the members of the Class through direct mailing, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under state law and federal law.

194.    **Typicality**:  Plaintiffs' claims are typical of the claims of the other members of the Class which they seek to represent under Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs and each member of the Class has been subjected to the same deceptive and improper practices and has been damaged in the same manner thereby.

195.    **Adequacy**:  Plaintiffs will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4).  Plaintiffs are adequate representatives of the Class because they have no interests which are adverse to the interests of the members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and, to that end, Plaintiffs have retained counsel who are competent and experienced in handling class action litigation on behalf of consumers.

196.    **Superiority**:  A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)     The expense and burden of individual litigation makes it economically unfeasible for members of the Class to seek to redress  their claims other than through the procedure of a class action;

(b)     If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members to seek to redress their claims other than through the procedure of a class action; and

(c)     Absent a class action, Chrysler likely would retain the benefits of its wrongdoing, and there would be a failure of justice.

197.    Common questions of law and fact exist as to the members of the Class, as required by Federal Rule of Civil Procedure 23(a)(2), and predominate over any questions which affect individual members of the Class within the meaning of Federal Rule of Civil Procedure 23(b)(3).

198.    The common questions of fact include, but are not limited to, the following:

(a)     Whether the Class Vehicles share a common defect in that the TIPM is prone to sudden and unexpected failure during normal operation, leaving occupants of the Class Vehicles vulnerable to crashes, serious injury, or death;

(b)     Whether the TIPM installed in the Class Vehicles is prone to sudden failure;

(c)     Whether Chrysler knew or should have known that the TIPM installed in the Class Vehicles is prone to sudden failure;

(d)     Whether Chrysler had a duty to disclose that the TIPM installed in the Class Vehicles is prone to sudden failure;

(e)     Whether Chrysler breached its duty to disclose that the TIPM installed in the Class Vehicles is prone to sudden failure;

(f)     Whether Chrysler's conduct, as alleged herein, was unlawful, unfair, or fraudulent under the consumer protection laws of all 50 states;

(g)     Whether Chrysler's conduct was a breach of the written warranty under the Magnuson-Moss Warranty Act;

(h)     Whether Chrysler was unjustly enriched at the expense of the Class;

(i)     Whether Chrysler actively concealed material facts from Plaintiffs and members of the Class for the purpose of transferring the cost of the TIPM failure to consumers; and

(j)     Whether Plaintiffs and members of the Class are entitled to restitution and damages.

199.    In the alternative, this action is certifiable under the provisions of Federal Rule of Civil Procedure 23(b)(1) and/or 23(b)(2) because:

(a)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Chrysler;

(b)     The prosecution of separate actions by individual members of the Class would create a risk of adjudications as to them which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)     Chrysler has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

200.    Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**VIOLATIONS ALLEGED**

**CLAIMS BROUGHT ON BEHALF OF THE NATIONWIDE CLASS**

### CLAIM I: VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

201. All Plaintiffs ("Plaintiffs," for the purposes of the Nationwide Class claims) hereby incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

202. Plaintiffs Probasco, Garcia, and Taylor bring this Claim on behalf of the Nationwide Class ("Class," for the purposes of this Claim).

203. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301, *et seq.*, by virtue of 28 U.S.C. § 1332 (a)–(d).

204. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

205. Chrysler is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

206. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

207. 15 U.S.C. § 2310(d)(1) provides a claim for relief for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

208. Chrysler's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

209. Chrysler has breached its warranty to provide goods that are free from defects, and Plaintiffs and each of the other Nationwide Class members have suffered damages as a result of Chrysler's breach.

210. The Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1), provides a claim for relief for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

211. Chrysler provided Plaintiffs and the other National Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Chrysler warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

212. Chrysler breached its express and implied warranties as described in more detail above. Without limitation, the Class Vehicles are equipped with the TIPM, a defective electronic unit within the Class Vehicles. The Class Vehicles share a common defect in that the TIPM is prone to sudden and unexpected failure during normal operation, leaving occupants of the Class Vehicles vulnerable to crashes, serious injury, or death.

213. Chrysler's written warranties also contain purported disclaimers of the implied warranties of merchantability and fitness for a particular purpose. These disclaimers are ineffective pursuant to 15 U.S.C. § 2308.

214. In its capacity as a warrantor, Chrysler has knowledge of the inherent defects in the Class Vehicles. Any efforts by Chrysler to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the defective TIPM is null and void.

215. Any limitations Chrysler might seek to impose on its warranties are procedurally unconscionable. There was an unequal bargaining power between Chrysler and Plaintiffs and the other National Class members, because, at the time of purchase and lease, Plaintiffs and the other National Class members had no other options for purchasing warranty coverage other than directly from Chrysler and its agents.

216. Any limitations Chrysler might seek to impose on its warranties are substantively unconscionable. Chrysler knew that the Class Vehicles were defective and would continue to pose safety risks after the warranty purportedly expired. Chrysler failed to disclose these defects to Plaintiffs and the other National Class members. Thus, Chrysler's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

217. Plaintiffs and each of the other Nationwide Class members have had sufficient direct dealings with either Chrysler or its agents (dealerships and technical support) to establish privity of contract between Chrysler, on one hand, and Plaintiffs and each of the other Nationwide Class members on the other hand.  Nonetheless, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between Chrysler and its dealers, and specifically, of Chrysler's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements

were designed for and intended to benefit the consumers only.  Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

218.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Chrysler notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

219.    Moreover, affording Chrysler a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  At the time of sale or lease of each Class Vehicle, Chrysler knew, should have known, or was reckless in not knowing of its failure to disclose information concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Chrysler a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

220.    Plaintiffs and other Nationwide Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Chrysler is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Nationwide Class members have not re-accepted their Class Vehicles by retaining them.

221.    In addition, Chrysler's acts and omissions in violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, constitute "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and, accordingly, they are unlawful.  15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

222.    Pursuant to 15 U.S.C. § 2310(d)(3), the amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

223.    Plaintiffs, individually and on behalf of the other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

224.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other National Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other National Class members in connection with the commencement and prosecution of this action.

225.    Moreover, Plaintiffs and the other National Class members are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).  Based on Chrysler's continuing failures to fix the known dangerous defects, Plaintiffs seek a declaration that Chrysler should recall the Class Vehicles to repair or replace the defective TIPMs, Chrysler has not adequately implemented repair commitments and requirements and general commitments to fix it's failed processes, and injunctive relief in the form of judicial supervision over any future recall process is warranted.

Plaintiffs also seek the establishment of a Chrysler-funded program for Plaintiffs and the other National Class members to recover out-of-pocket costs incurred in attempting to rectify the defective TIPM in their vehicles.

## CLAIMS BROUGHT ON BEHALF OF THE ARIZONA SUBCLASS

### CLAIM II: VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT
### (ARIZ. REV. STAT. §§ 44-1521, *et seq.*)

226.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

227.    Plaintiff Probasco brings this Claim on behalf of the Arizona Subclass.

228.    Chrysler, Plaintiff Probasco, and the Arizona Subclass are "persons" as defined by the Arizona Consumer Fraud Act ("Arizona CFA").  ARIZ. REV. STAT. § 44-1521(6).

229.    The Class Vehicles are "merchandise" under the Arizona CFA.  *Id.* § 44-1521(5).

230.    The Arizona Subclass (including Plaintiff Probasco) and Chrysler engaged in "sales" as defined by the Arizona CFA.  *Id.* § 44-1521(7).

231.    The Arizona CFA prohibits "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby[.]" *Id.* § 44-1522(A).

232.    As set forth herein, Chrysler actively and willfully engaged in unconscionable or deceptive acts or practices that violated the Arizona CPA by willfully misrepresenting the safety and quality of the Class Vehicles and by willfully concealing from the public, Plaintiff Probasco,

and the Arizona Subclass material information about the TIPM defects and the life-threatening risks posed thereby to Plaintiff Probasco and the Arizona Subclass. Chrysler did not disclose to Plaintiff Probasco and the Arizona Subclass, at the time of sale or otherwise, that the TIPM had serious safety defects.

233. Chrysler engaged in these actions with the intent that Plaintiff Probasco and the Arizona Subclass rely upon Chrysler's acts, concealment, suppression, or omissions.

234. As set forth herein, Chrysler had a duty to disclose the TIPM defects and the risks posed thereby to Plaintiff Probasco and the Arizona Subclass.

235. Plaintiff Probasco and the Arizona Subclass were injured as a direct and proximate result of Chrysler's misrepresentations and omissions because, among other things, Plaintiff Probasco and the Arizona Subclass overpaid for their Class Vehicles and therefore did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. In addition, Plaintiff Probasco and the Arizona Subclass have paid for unnecessary repairs to parts other than the TIPM, for TIPM diagnoses, repairs, and replacements, and for towing and/or rental cars. Meanwhile, Chrysler has sold more vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

236. Plaintiff Probasco and the Arizona Subclass risk irreparable injury because of Chrysler's acts and omissions in violation of the Arizona CPA, and these violations present a continuing risk to Plaintiff Probasco, the Arizona Subclass, and the general public. Chrysler's unlawful acts and practices complained of herein affect the public interest.

237. Plaintiff Probasco and the Arizona Subclass seek monetary relief against Chrysler in an amount to be determined at trial.

238.    Plaintiff Probasco and the Arizona Subclass seek punitive damages because Chrysler engaged in aggravated and outrageous conduct with an evil mind.

239.    Plaintiff Probasco and the Arizona Subclass seek an order (1) enjoining Chrysler's deceptive practices; (2) enjoining Chrysler to replace the defective TIPMs in Arizona Subclass members' vehicles with new, non-defective TIPMs; (3) enjoining Chrysler to inspect any replacement TIPM installed in an Arizona Subclass member's vehicle to determine whether that TIPM is defective and, if so, to replace that TIPM with a new, non-defective TIPM; (4) for declaratory relief; (5) for reasonable costs and attorney's fees; and (6) for any other just and proper relief available under the Arizona CPA.

## CLAIM III: BREACH OF CONTRACT / COMMON LAW WARRANTY
### (UNDER ARIZONA LAW)

240.    Plaintiff Probasco incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

241.    Plaintiff Probasco brings this Claim on behalf of the Arizona Subclass.

242.    Chrysler's warranties limited the remedies available to Plaintiff Probasco and the Arizona Subclass to repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Chrysler, and/or warranted the quality or nature of those parts and services to Plaintiff Probasco and the Arizona Subclass.

243.    Chrysler breached this warranty or contract obligation by failing to repair the defective Class Vehicles, or to replace them, free of charge.

244.    As a direct and proximate result of Chrysler's breach of contract or common law warranty, Plaintiff Probasco and the Arizona Subclass have been damaged in an amount to be

proven at trial, which shall include, but are not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## CLAIM IV: FRAUDULENT CONCEALMENT
### (UNDER ARIZONA LAW)

245.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

246.    Plaintiff Probasco brings this Claim on behalf of the Arizona Subclass.

247.    Chrysler had, and still has, a duty to disclose the TIPM defects in the Class Vehicles because they were known and/or accessible only to Chrysler, which had superior knowledge and access to the relevant facts, and because Chrysler knew that the relevant facts were not known or reasonably discoverable by Plaintiff Probasco or the Arizona Subclass.

248.    Chrysler still has not made full and adequate disclosure and continues to defraud Plaintiff Probasco and the Arizona Subclass by concealing material information regarding the TIPM defects that exist in the Class Vehicles and the risks posed by those defects.

249.    Chrysler actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would have hurt the brand's image and cost Chrysler money, and it did so at the expense of Plaintiff Probasco and the Arizona Subclass.

250.    Because Chrysler knew that any reasonable consumer would not purchase a vehicle with a defective TIPM, or would pay only substantially less for that vehicle, and Chrysler was concealing material information about the TIPM defects, Chrysler must have known that Plaintiff Probasco and the Arizona Subclass were acting on the basis of mistaken knowledge that their vehicles were safe and reliable when they decided to purchase or lease them at a market price (without a discount to reflect that they contained a defective TIPM).

251.    Plaintiff Probasco and the Arizona Subclass were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts.  Plaintiff Probasco's and the Arizona Subclass's actions were justified. Chrysler was in exclusive control of the material facts and such facts were not known to the public, Plaintiff Probasco, or the Arizona Subclass.

252.    Plaintiff Probasco and the Arizona Subclass members reasonably relied to their detriment upon Chrysler's omissions of material fact in making their purchasing and leasing decisions.  Plaintiff Probasco and the Arizona Subclass members were led to believe, by Chrysler's fraudulent concealment, that the Class Vehicles were safe and that their electrical systems would function normally and without placing them directly in harm's way.

253.    As a direct and proximate result of Chrysler's fraudulent concealment, Plaintiff Probasco and the other Arizona Subclass members have been harmed and they seek all damages permitted by law, including diminution in value of their Class Vehicles and repair reimbursement, in an amount to be determined at trial.

254.    Chrysler's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Probasco's and the Arizona Subclass's rights and well-being to enrich Chrysler.  Chrysler's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

255.    Plaintiff Probasco and the Arizona Subclass seek also injunctive relief, declaratory relief, reasonable costs and attorney's fees, and any other just and proper relief available in law or equity.

## CLAIMS BROUGHT ON BEHALF OF THE FLORIDA SUBCLASS

### CLAIM V: VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
(FLA. STAT. §§ 501.21, *et seq.*)

256.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

257.     Plaintiff Tamburello brings this Claim on behalf of the Florida Subclass.

258.     Plaintiff Tamburello and the Florida Subclass are "consumers" as defined by the Florida Deceptive and Unfair Trade Practices Act ("Florida DUTPA").  FLA. STAT. § 501.203(7).

259.     At all relevant times, Chrysler engaged in "trade or commerce" as defined by the Florida DUTPA.  *Id.* § 501.203(8).

260.     The Florida DUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"  *Id.* § 501.204(1).

261.     As set forth herein, Chrysler actively and willfully engaged in unconscionable acts or practices and in unfair or deceptive acts or practices in violation of the Florida DUTPA by willfully misrepresenting the safety and quality of the Class Vehicles and by willfully concealing from the public, Plaintiff Tamburello, and the Florida Subclass material information about the TIPM defects and the life-threatening risks posed thereby to Plaintiff Tamburello and the Florida Subclass.  Chrysler did not disclose to Plaintiff Tamburello or the Florida Subclass, at the time of sale or otherwise, that the TIPM had serious safety defects.

262.     As set forth herein, Chrysler had a duty to disclose the TIPM defects and the risks posed thereby to Plaintiff Tamburello and the Florida Subclass.

263.     Chrysler should have known that its conduct violated the Florida DUTPA.

264.    Plaintiff Tamburello and the Florida Subclass were injured as a direct and proximate result of Chrysler's misrepresentations and omissions because, among other things, Plaintiff Tamburello and the Florida Subclass overpaid for their Class Vehicles and therefore did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  In addition, Plaintiff Tamburello and the Florida Subclass have paid for unnecessary repairs to parts other than the TIPM, for TIPM diagnoses, repairs, and replacements, and for towing and/or rental cars.  Meanwhile, Chrysler has sold more vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

265.    Plaintiff Tamburello and the Florida Subclass risk irreparable injury because of Chrysler's acts and omissions in violation of the Florida DUTPA, and these violations present a continuing risk to Plaintiff Tamburello, the Florida Subclass, and the general public.  Chrysler's unlawful acts and practices complained of herein affect the public interest.

266.    Plaintiff Tamburello and the Florida Subclass are entitled to recover their actual damages and reasonable attorney's fees and costs, under the Florida DUTPA.  *Id.* §§ 501.211(2), 501.2105(1).

267.    Plaintiff Tamburello and the Florida Subclass seek also an order (1) enjoining Chrysler's deceptive and unfair trade practices; (2) enjoining Chrysler to replace the defective TIPMs in Florida Subclass members' vehicles with new, non-defective TIPMs; (3) enjoining Chrysler to inspect any replacement TIPM installed in a Florida Subclass member's vehicle to determine whether that TIPM is defective and, if so, to replace that TIPM with a new, non-defective TIPM; (4) enjoining Chrysler from installing the defective TIPM in future vehicles;

(5) declaratory relief; and (6) for any other just and proper relief available under the Florida DUTPA.

## CLAIMS BROUGHT ON BEHALF OF THE NEW YORK SUBCLASS

### CLAIM VI: DECEPTIVE ACTS OR PRACTICES
### (N.Y. GEN. BUS. LAW § 349)

268.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

269.    Plaintiff Garcia brings this Claim on behalf of the New York Subclass.

270.    Plaintiff Garcia and New York Subclass members are "persons" within the meaning of New York General Business Law ("New York GBL") § 349(h).

271.    Chrysler is a "person," "firm," "corporation," and "association" within the meaning of New York GBL § 349.

272.    "Deceptive acts or practices in the conduct of any business, trade or commerce" are unlawful.  N.Y. GEN. BUS. LAW § 349.  Deceptive acts or practices are those that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.*

273.    As set forth herein, Chrysler actively and willfully engaged in deceptive acts or practices in violation of the New York GBL § 349 by willfully misrepresenting the safety and quality of the Class Vehicles and by willfully concealing from the public, Plaintiff Garcia, and the New York Subclass material information about the TIPM defects and the life-threatening risks posed thereby to Plaintiff Garcia and the New York Subclass.  Chrysler did not disclose to Plaintiff Garcia or the New York Subclass, at the time of sale or otherwise, that the TIPM had serious safety defects.  This conduct was likely to mislead a reasonable consumer acting reasonably under the circumstances.

274.    As set forth herein, Chrysler had a duty to disclose the TIPM defects and the risks posed thereby to Plaintiff Garcia and the New York Subclass.

275.    Plaintiff Garcia and the New York Subclass were injured as a direct and proximate result of Chrysler's misrepresentations and omissions because, among other things, Plaintiff Garcia and the New York Subclass overpaid for their Class Vehicles and therefore did not receive the benefit of their bargain, their Class Vehicles have suffered a diminution in value. In addition, Plaintiff Garcia and the New York Subclass have paid for unnecessary repairs to parts other than the TIPM, for TIPM diagnoses, repairs, and replacements, and for towing and/or rental cars.  Meanwhile, Chrysler has sold more vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

276.    The New York Subclass risks irreparable injury because of Chrysler's acts and omissions in violation of New York GBL § 349, and these violations present a continuing risk to the New York Subclass and the general public.  Chrysler's unlawful acts and practices complained of herein affect the public interest.

277.    Plaintiff Garcia and the New York Subclass seek actual damages (or fifty dollars per violation, whichever is greater), treble damages for Chrysler's willful and/or knowing violations of this statute, and reasonable attorney's fees, under New York GBL § 349(h).

278.    Plaintiff Garcia and the other New York Subclass seek also an order (1) enjoining Chrysler's deceptive and unfair trade practices; (2) enjoining Chrysler to replace the defective TIPMs in New York Subclass members' vehicles with new, non-defective TIPMs; (3) enjoining Chrysler to inspect any replacement TIPM installed in a New York Subclass member's vehicle to determine whether that TIPM is defective and, if so, to replace that TIPM with a new, non-

defective TIPM; (4) enjoining Chrysler from installing the defective TIPM in future vehicles; (5) declaratory relief; and (6) for any other just and proper relief available under New York GBL §§ 349–350.

## CLAIM VII: FALSE ADVERTISING
### (N.Y. GEN. BUS. LAW § 350)

279.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

280.    Plaintiff Garcia brings this Claim on behalf of the New York Subclass.

281.    Chrysler was and is engaged in the "conduct of business, trade or commerce" within the meaning of New York GBL § 350.

282.    New York GBL § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity[.]"  N.Y. GEN. BUS. LAW § 350-a.

283.    Chrysler caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Chrysler, to be untrue and misleading to consumers, Plaintiff Garcia and the New York Subclass.

284.    Chrysler has violated § 350 because the misrepresentations and omissions regarding the defects, and Chrysler's systemic devaluation of safety, as set forth above, were material and likely to deceive a reasonable consumer.

285.    Plaintiff Garcia and the New York Subclass members have suffered an injury, including the loss of money or property, as a result of Chrysler's false advertising.  In purchasing or leasing their vehicles, Plaintiff Garcia and the New York Subclass relied on the misrepresentations and/or omissions of Chrysler with respect to the safety and reliability of the Class Vehicles. Chrysler's representations were false and/or misleading because the concealed defects and safety issues seriously undermine the value of the Class Vehicles.  Had Plaintiff Garcia and the New York Subclass known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

286.    Under New York GBL § 350(e), Plaintiff Garcia and the New York Subclass seek monetary relief against Chrysler, measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 each for New York Subclass member.  Because Chrysler's conduct was committed willfully and knowingly, Plaintiff Garcia and the New York Subclass are entitled to recover treble damages, up to $10,000, for each New York Subclass member.

287.    Plaintiff Garcia and the New York Subclass seek also an order enjoining Chrysler's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under New York GBL §§ 349–350.

## CLAIM VIII: BREACH OF EXPRESS WARRANTY
### (N.Y. U.C.C. § 2-313)

288.    Plaintiff Garcia realleges and incorporates by reference all above paragraphs as though fully set forth herein.

289.    Plaintiff Garcia brings this Claim on behalf of the New York Subclass.

290.    Chrysler is a "merchant" with respect to motor vehicles within the meaning of N.Y. U.C.C. § 2-104(1).

291.    As set forth above, in its Basic Limited Warranty, Vehicle Protection Plans, Maximum Care Coverage and Available Lifetime Certified Warranty Upgrades and other warranties, Chrysler warranted that Plaintiff Garcia and the other New York Subclass members would be fully covered, with no payment by Plaintiff Garcia and the other New York Subclass members, for costs for repairs and adjustments, including all parts and labor connected with them, for "any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

292.    The defective TIPM was present in the Class Vehicles when the vehicles left the custody and control of Chrysler.

293.    Because the Class Vehicles contained the defective TIPM and failed to repair or adjust it free of charge to Plaintiff Garcia and the other New York Subclass members, Chrysler breached the express warranty.

294.    Chrysler was provided actual or constructive notice of breach of the express warranty, and had a reasonable opportunity to cure the defect.

295.    As a direct and proximate result of Chrysler's breach of express warranty, Plaintiff Garcia and the other New York Subclass members have been harmed and they seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be determined at trial.

## CLAIMS BROUGHT ON BEHALF OF THE SOUTH DAKOTA SUBCLASS

### CLAIM IX: CONSUMER PROTECTION LAW
### (S.D. CODIFIED LAWS §§ 37-24-1, *et. seq.*)

296.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

297.    Plaintiff Caron brings this Claim on behalf of the South Dakota Subclass.

298.    The Class Vehicles are "goods," "merchandise," and "retail merchandise" under the South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL"). S.D. CODIFIED LAWS § 37-24-1(6), (7), (11A).

299.    Plaintiff Caron, the South Dakota Subclass members, and Chrysler are and were at all relevant times "persons" under the South Dakota CPL. *Id.* § 37-24-1(8).

300.    At all relevant times, Chrysler engaged in "trade" and "commerce" as defined by the South Dakota CPL. *Id.* § 37-24-1(13).

301.    The South Dakota CPL prohibits deceptive acts or practices, defined for relevant purposes as "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby[.]" *Id.* § 37-24-6(1).

302.    The South Dakota CPL provides a private right of action for "[a]ny person who claims to have been adversely affected by any act or practice declared to be unlawful by § 37-24-6[.]" *Id.* § 37-24-31.

303.    As set forth herein, Chrysler actively and willfully engaged in deceptive acts or practices in violation of the South Dakota CPL by willfully misrepresenting the safety and

quality of the Class Vehicles and by willfully concealing from the public, Plaintiff Caron, and the South Dakota Subclass material information about the TIPM defects and the life-threatening risks posed thereby to Plaintiff Caron and the South Dakota Subclass.  Chrysler did not disclose to Plaintiff Caron or the South Dakota Subclass, at the time of sale or otherwise, that the TIPM had serious safety defects.

304.    As set forth herein, Chrysler had a duty to disclose the TIPM defects and the risks posed thereby to Plaintiff Caron and the South Dakota Subclass.

305.    Plaintiff Caron and the South Dakota Subclass were injured as a direct and proximate result of Chrysler's misrepresentations and omissions because, among other things, Plaintiff Caron and the South Dakota Subclass overpaid for their Class Vehicles and therefore did not receive the benefit of their bargain, their Class Vehicles have suffered a diminution in value.  In addition, Plaintiff Caron and the South Dakota Subclass have paid for unnecessary repairs to parts other than the TIPM, for TIPM diagnoses, repairs, and replacements, and for towing and/or rental cars.  Meanwhile, Chrysler has sold more vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

306.    Plaintiff Caron and the South Dakota Subclass risk irreparable injury because of Chrysler's acts and omissions in violation of the North Carolina UDTPA, and these violations present a continuing risk to Plaintiff Caron, the South Dakota Subclass, and the general public.  Chrysler's unlawful acts and practices complained of herein affect the public interest.

307.    Under the South Dakota CPL, Plaintiff Caron and the South Dakota Subclass are entitled to a recovery of their actual damages suffered as a result of Chrysler's deceptive acts or practices.  *Id.* § 37-24-31.

## CLAIMS BROUGHT ON BEHALF OF THE TEXAS SUBCLASS

### CLAIM X: VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT
**(TEX. BUS. & COM. CODE §§ 17.41, *et seq.*)**

308.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

309.    Plaintiff Taylor brings this Claim on behalf of the Texas Subclass.

310.    Plaintiff Taylor and Chrysler are "persons" as defined by the Texas Deceptive Trade Practices Act ("Texas DTPA").  TEX. BUS. & COM. CODE § 17.45(3).

311.    The Class Vehicles are "goods" under the Texas DTPA.  *Id.* § 17.45(1).

312.    Plaintiff and the other Texas Subclass members are "consumers" under the Texas DTPA.  *Id.* § 17.45(4).

313.    Chrysler has at all relevant times engaged in "trade" and "commerce" as defined in the Texas DTPA, *id.* § 17.45(6), by advertising, offering for sale, selling, leasing, and/or distributing Class Vehicles in Texas, thereby directly or indirectly affecting Texas citizens through that trade and commerce.

314.    The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of the Texas DTPA.

315.    By failing to disclose and actively concealing the defects in the TIPM unit in the Class Vehicles, Chrysler engaged in deceptive business practices prohibited by the Texas DTPA, including (1) representing the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing the Class Vehicles are of a particular standard, quality, and grade when they are not. (3) advertising Class Vehicles with the intent not to sell them as

advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

316.    Chrysler knew that the TIPMs in the Class Vehicles were defectively designed or manufactured, would suddenly fail without warning, and were not suitable for their intended use. Chrysler nevertheless failed to warn Plaintiff Taylor or the Texas Subclass about this defect.

317.    As set forth above, Chrysler had a duty to disclose the TIPM defects and the risks posed thereby to Plaintiff Taylor and the Texas Subclass.

318.    Chrysler's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Taylor and the Texas Subclass, about the true performance and characteristics of the TIPM.

319.    Chrysler's intentional concealment of and failure to disclose the defective nature of the Class Vehicles to Plaintiff Taylor and the Texas Subclass constitutes "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff Taylor and the Texas Subclass, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff Taylor and the Texas Subclass.

320.    Chrysler is liable also under Tex. Bus & Com. Code § 17.50(a) because Chrysler's breach of the implied warranty of merchantability set forth herein was a producing cause of economic damages sustained by Plaintiff Taylor and the Texas Subclass.

321.    As a result of its violations of the Texas DTPA detailed above, Chrysler caused actual damage to Plaintiff Taylor and the Texas Subclass, and, if not stopped, will continue to

cause harm to Plaintiff Taylor and the Texas Subclass. Plaintiff Taylor and the Texas Subclass currently own or lease, or within the class period have owned or leased, a Class Vehicles that is defective. Defects associated with the TIPM unit caused the value of the Class Vehicles to decrease.

322. All procedural prerequisites, including notice, have been met. The giving of notice to Chrysler is rendered impracticable pursuant to Tex. Bus. & Com. Code § 17.505(b) and unnecessary because Chrysler has notice of the claims against it through the numerous complaints filed against it. Pursuant to Tex. Bus. & Com. Code § 17.505(b), Plaintiff Taylor and the Texas Subclass, will send to the Texas Consumer Protection Division a copy of this Complaint.

323. Plaintiff Taylor and the Texas Subclass sustained damages as a result of Chrysler's unlawful acts and are, therefore, entitled to damages. Plaintiff Taylor and the Texas Subclass seek treble the amount of their economic damages because Chrysler intentionally concealed and failed to disclose the defective nature of the Class Vehicles.

324. Plaintiff Taylor and the Texas Subclass seek also an order (1) enjoining Chrysler's deceptive practices; (2) enjoining Chrysler to replace the defective TIPMs in Texas Subclass members' vehicles with new, non-defective TIPMs; (3) enjoining Chrysler to inspect any replacement TIPM installed in a Texas Subclass member's vehicle to determine whether that TIPM is defective and, if so, to replace that TIPM with a new, non-defective TIPM; (4) reasonable costs and attorney's fees; and (5) for any other just and proper relief available under the Texas DTPA.

## CLAIM XI: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (TEX. BUS. & COM. CODE § 2.314)

325.    Plaintiff Taylor realleges and incorporates by reference all above paragraphs as though fully set forth herein.

326.    This Claim is brought on behalf of only the Texas Subclass.

327.    Chrysler is a merchant with respect to motor vehicles within the meaning of TEX. BUS. & COM. CODE § 2.104(1).

328.    Under TEX. BUS. & COM. CODE § 2.314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the instant sales transactions when the Texas Subclass members purchased or leased their Class Vehicles.

329.    The implied warranty of merchantability extended to Plaintiff Taylor and the other Texas Subclass members because they were foreseeable and intended users of the Class Vehicles.

330.    Plaintiff Taylor and the other Texas Subclass members used the Class Vehicles in the manner that they were intended by Chrysler to be used.

331.    When Chrysler sold the Class Vehicles, it knew the intended use of the products and impliedly warranted that the products were of good and merchantable quality and were fit for the purposes for which they were intended.

332.    Plaintiff Taylor and the other Texas Subclass members reasonably relied on the representations of Chrysler and its agents which induced them to purchase or lease the Class Vehicles.

333.    Plaintiff Taylor and the other Texas Subclass members relied on the skill and judgment of Chrysler and its agents to furnish suitable goods which would not be defective and which would function properly.

334.    Chrysler and its agents knew or had reason to know the particular purpose for which Plaintiff Taylor and the other Texas Subclass members would use the Class Vehicles.

335.    The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are sold and used because, among other reasons, their TIPM systems were defective.  Specifically, the Class Vehicles are inherently defective in that problems with the TIPM system which are prone to sudden and unexpected failure during normal operations, leaving occupants of the Class Vehicles vulnerable to crashes, serious injury, or death, and which prevent drivers from enjoying many features of the Class Vehicles they purchased and/or leased—features for which the drivers paid as part of the vehicles' purchase or lease price.  The defective TIPM is prone to cause a plethora of electrical problems, including electrical fires, in the Class Vehicles.  In addition, the TIPM system was not adequately tested before being installed in the Class Vehicles.

336.    The defects in the TIPM systems in the Class Vehicles existed when the vehicles left the control of Chrysler.

337.    By selling the Class Vehicles with the defects in the TIPM systems to Plaintiff Taylor and the other Texas Subclass members, Chrysler breached the implied warranty of merchantability in that the goods were not fit for the ordinary purposes for which those goods are used.

338.    Chrysler was provided actual or constructive notice of breach of the express warranty, and had a reasonable opportunity to cure the defect.

339.    As a direct and proximate result of Chrysler's breach of the implied warranty of merchantability, Plaintiff Taylor and the other Texas Subclass members have been harmed and they seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be determined at trial.

## **REQUEST FOR RELIEF**

WHEREFORE Plaintiffs pray for judgment as follows:

A. For an order certifying the proposed classes and appointing Plaintiffs and their counsel to represent the classes;

B. For an order awarding Plaintiffs and the members of the classes actual, consequential, statutory, punitive or any other form of damages provided by and pursuant to the statutes cited above;

C. For an order awarding Plaintiffs and the members of the classes restitution, disgorgement, or other equitable relief provided by and pursuant to the statutes cited above or as the Court deems proper;

D. For an order requiring Chrysler to adequately disclose and remedy the TIPM defect and an order enjoining Chrysler from incorporating the defective TIPM into its vehicles in the future;

E. For an order awarding Plaintiffs and the members of the classes pre-judgment and post-judgment interest;

F. For an order awarding Plaintiffs and the members of the classes reasonable attorney fees and costs of suit, including expert witness fees; and;

G. For an order awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.


Dated:  September 15, 2015
        New York, New York

                                        Respectfully submitted,


                                        */s/ Curt D. Marshall*
                                        Curt D. Marshall (CM-9692)
                                        cmarshall@weitzlux.com
                                        Robin L. Greenwald (admitted *pro hac vice*)
                                        rgreenwald@weitzlux.com
                                        Christopher B. Dalbey (admitted *pro hac vice*)
                                        cdalbey@weitzlux.com
                                        **WEITZ & LUXENBERG, P.C.**
                                        700 Broadway
                                        New York, New York 10003
                                        Telephone:     (212) 558-5500
                                        Facsimile:     (212) 344-5461


                                        Roland Tellis (admitted *pro hac vice*)
                                        rtellis@baronbudd.com
                                        David Fernandes (admitted *pro hac vice*)
                                        dfernande@baronbudd.com
                                        **BARON & BUDD, P.C.**
                                        15910 Ventura Boulevard, Suite 1600
                                        Encino, California  91436
                                        Telephone:     (818) 839-2333
                                        Facsimile:     (818) 986-9698


                                        Kirsten Soto (admitted *pro hac vice*)
                                        ksoto@baronbudd.com
                                        **BARON & BUDD, P.C.**
                                        3102 Oak Lawn Avenue, Suite 1100
                                        Dallas, Texas 75219
                                        Telephone:     (214) 521-3605
                                        Facsimile:     (214) 520-1181

                                        *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on September 15, 2015 the foregoing was filed electronically through the Court's ECF filing system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties as indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.


/s/ Kirsten Soto
Kirsten Soto

*Attorney for Plaintiffs*